OPINION
{¶ 1} Defendant-appellant, Darrel F. Riggs ("appellant"), appeals from the judgments of the Franklin County Court of Common Pleas, following a jury verdict, finding him guilty of four counts of gross sexual imposition, in violation of R.C. 2907.05. These appeals relate to only one count. For the following reasons, we affirm.
 {¶ 2} On November 4, 2002, the Franklin County Grand Jury indicted appellant on five counts of gross sexual imposition, in violation of R.C. 2907.05, in Franklin County Court of Common Pleas case No. 02CR11-6538. On March 1, 2004, the Franklin County Grand Jury indicted appellant on two counts of gross sexual imposition, in violation of R.C. 2907.05, in Franklin County Court of Common Pleas case No. 04CR04-2689. The alleged victim in all counts was appellant's step-granddaughter, "M.C." The trial court consolidated appellant's cases and, prior to trial, dismissed Counts 4 and 5 of the 2002 indictment, leaving a total of five counts.
 {¶ 3} The first three counts in the 2002 indictment relate to alleged conduct in 1998. Counts 1 and 2 allege that appellant had sexual contact with M.C., who was less than 13 years of age. Count 3 alleges that appellant caused M.C., being less than 13 years of age, to have sexual contact with him. The two counts in the 2004 indictment allege that appellant had sexual contact with M.C. and/or caused M.C. to have sexual contact with appellant and purposely compelled M.C. to do so by force or threat of force. In the 2004 indictment, Count 1 relates to alleged conduct in 1999, and Count 2 relates to alleged conduct in 2000.
 {¶ 4} A jury trial commenced on August 25, 2004. After the close of the state's case, the trial court granted appellant's Crim. R. 29 motion for acquittal as to Count 2 of the 2004 indictment based on the lack of any testimony that sexual contact between appellant and M.C. occurred in 2000. The jury found appellant guilty of the remaining four counts, and the court sentenced appellant accordingly.
 {¶ 5} On December 1, 2004, appellant filed motions for delayed appeal, which this court granted on January 25, 2005. Appellant asserts the following assignment of error:
THE JURY'S VERDICT AS TO THE ELEMENT OF FORCE WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE, THEREBY DEPRIVING APPELLANT OF A FAIR TRIAL AND DUE PROCESS OF LAW.
 {¶ 6} Because the allegations in the 2002 counts concerned appellant's actions in 1998, when M.C. was less than 13 years old, force was not a required element of those charges. See R.C. 2907.05(A)(4). Only the allegations in the 2004 indictment, which relate to conduct after M.C. turned 13 years of age, required a showing of force or threat of force. Therefore, this appeal involves only appellant's conviction under Count 1 of the 2004 indictment.
 {¶ 7} R.C. 2907.05(A)(1) provides, in pertinent part:
(A) No person shall have sexual contact[1] with another, not the spouse of the offender * * * when * * *:
(1) The offender purposely compels the other person * * * to submit by force or threat of force.
To prove gross sexual imposition under R.C. 2907.05, based on appellant's conduct after M.C. turned 13, the state needed to prove beyond a reasonable doubt that appellant purposely compelled M.C. to submit to sexual contact by force or threat of force.
 {¶ 8} Appellant's convictions were based upon testimony adduced at trial concerning sexual contact between appellant and M.C. when M.C. was 12 and 13 years old. M.C. was born on January 1, 1986. In 1994, when M.C. was eight years old, Children's Services placed her with appellant and his wife, Donna Riggs ("Donna"), M.C.'s maternal grandmother. At first, M.C. enjoyed living with appellant and Donna, and assumed she would remain in their custody until she graduated from high school and could live on her own. Appellant and Donna provided for M.C.'s needs and acted as her parents. Until she was 12 years old, M.C. had a good relationship with appellant and Donna.
 {¶ 9} M.C.'s relationship with appellant changed during the summer of 1998, when she was 12 years old. At trial, M.C. testified about the events that caused that change. The first such event occurred when M.C. and appellant were alone in the laundry room. When M.C. told appellant that she had to go to the bathroom, appellant asked her to urinate on him, and she complied. M.C. testified about a series of sexual contacts between appellant and herself that began shortly thereafter. Appellant denied the laundry room incident as well as any sexual contact with M.C.
 {¶ 10} In the summer of 1998, the first sexual contact between appellant and M.C. occurred while appellant and M.C. were alone together in the pool. Appellant removed his swimsuit and made M.C. remove her swimsuit. Appellant then proceeded to touch M.C.'s breasts, genitals, and buttocks.
 {¶ 11} After the initial incident in the pool, the same types of touching behaviors continued on different dates. On certain occasions, appellant asked M.C. to touch his genitals and, although she did not want to, M.C. complied because "he would always get in a bad mood if [she] tried to like say no or something." (Tr. at 59.) Appellant also asked M.C. to masturbate him, and she did so approximately four times in 1998. On other occasions, M.C. and appellant would lie naked on appellant's bed and engage in the same types of touching. Appellant also had M.C. shower or bathe with him, at which times he and M.C. would wash each other.
 {¶ 12} M.C. estimates that she touched appellant's genitals four times in 1998 and that appellant touched her on ten occasions in 1998. Once M.C. started back to school, the touching activities that began during the summer of 1998 continued "once in awhile." (Tr. at 61.)
 {¶ 13} M.C. expressly testified that the touching incidents continued into 1999, although she could not estimate how many times such incidents occurred in 1999. M.C. could not recall any incident during which she touched appellant in 1999, but stated that there were incidents of appellant touching her in 1999.
 {¶ 14} M.C. specifically testified about one incident that occurred at the end of 1999 (the "Christmas 1999 incident"), after a time period free from any sexual contact with appellant. M.C. described that incident as follows:
* * * It was just — like it was around Christmas time, and like everybody that — people were upstairs, and I was downstairs and he was downstairs, and I don't really remember what happened, but I know something did, like it was like he was trying, but I was like not interested and I was like, "no."
(Tr. at 62). M.C. clarified that, during the Christmas 1999 incident, appellant touched her breast on top of her shirt, after which M.C. "said, `no,' and just went upstairs." (Tr. at 72.) After the Christmas 1999 incident, M.C. lived with appellant and Donna for almost two years, during which no further sexual contact occurred.
 {¶ 15} M.C. testified that she felt she had no choice but to submit to the sexual contacts with appellant. M.C. testified that appellant was controlling, that she was afraid of appellant, and that appellant gave her more freedom when she complied. With the exception of the Christmas 1999 incident, each incident of sexual contact between appellant and M.C. in 1998 and 1999 occurred while appellant and M.C. were alone in the house. When she questioned appellant about his actions "he said it was like — like a learning experience or like — and at least I'm not out experimenting with a bunch of guys and getting pregnant and stuff." (Tr. at 68.) Appellant warned M.C. that, if Donna found out about his actions, Donna "would kill him[.]" (Tr. at 68.) Appellant's warnings upset M.C. because she wanted to continue living with appellant and Donna rather than going into foster care.
 {¶ 16} In his sole assignment of error, appellant argues that the jury's guilty verdict on Count 1 of the 2004 indictment was not supported by sufficient evidence on the element of force or threat of force. An appeal challenging the sufficiency of the evidence tests whether the evidence introduced at trial is legally sufficient to support a verdict as a matter of law. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. We examine the evidence to conclude "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion the trier of facts reached. Id. at 273. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but, whether, if believed, the evidence against a defendant would support a conviction. See Jenks at paragraph two of the syllabus;State v. Lockhart (Aug. 7, 2001), Franklin App. No. 00AP-1138.
 {¶ 17} Appellant argues that the state presented insufficient evidence for the jury to find force or threat of force beyond a reasonable doubt. R.C. 2901.01(A) defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." State v. Schaim (1992),65 Ohio St.3d 51, paragraph one of the syllabus. The use of the word "any" in the R.C. 2901.01(A) definition of "force" recognizes that differing degrees and manners of force may suffice, depending on the circumstances of the particular case. See State v. Lillard (May 23, 1996), Cuyahoga App. No. 69242.
 {¶ 18} In State v. Eskridge (1988), 38 Ohio St.3d 56, the Ohio Supreme Court addressed the case of a father who had vaginal intercourse with his four-year-old daughter and considered the force necessary to support a forcible rape conviction in such circumstances.[2] The court held:
The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength. * * *
Id. at paragraph one of the syllabus. The court noted an exception to the requirement of physical force in the special circumstances of a parent-child rape. Recognizing the coercion inherent when a parent sexually abuses his or her child, the court held that "[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." Id. at 58-59.
 {¶ 19} Since Eskridge, Ohio courts have applied the exception to the requirement of physical force in cases involving child-victims of sexual offenses outside the parent-child context. In State v. Dye (1998),82 Ohio St.3d 323, the Ohio Supreme Court revisited the issue of the force required to impose a life sentence on a defendant convicted of raping a child less than 13 years of age. The court noted its prior consideration of the force requirement in Eskridge and extended its exception to the need for overt physical force or threat of physical force to cases in which the defendant is not the child-victim's parent but, nevertheless, occupies a position of authority over the child. Specifically, the court held that "a person in a position of authority over a child under thirteen may be convicted of rape of that child with force pursuant to R.C. 2907.02(A)(1)(b) and (B) without evidence of express threat of harm or evidence of significant physical restraint."Dye at 329. Even before Dye, this court routinely applied the Eskridge
definition of force to cases in which the alleged offender, although not the child-victim's parent, held a position of authority over the child. See State v. Laws (Dec. 22, 1998), Franklin App. No. 98AP-306; State v.Towns (Aug. 29, 1996), Franklin App. No. 95APA11-1496.
 {¶ 20} Although Eskridge and Dye involved charges of rape rather than gross sexual imposition, the force elements under the two statutes require the same analysis. The statutory language defining the force elements for rape and gross sexual imposition is identical, and Ohio courts routinely apply the rationales of Eskridge and Dye to cases involving gross sexual imposition charges. See State v. Musgrave (Dec. 3, 1998), Summit App No. 18260; State v. Oddi, Delaware App. No. 02CAA01005, 2002-Ohio-5926; State v. Clay, Medina App. No. 04CA0033-M,2005-Ohio-6; State v. Dooley, Cuyahoga App. No. 84206, 2005-Ohio-628.
 {¶ 21} Appellant argues that the state made no showing of force over and above that necessary to accomplish the sexual contact itself. To prove the force element of a sexual offense, the state must establish force "beyond that force inherent in the crime itself." Dye at 327. Because appellant stood in a position of authority over M.C., who testified that appellant and Donna acted in place of her parents, the force required to commit a sexual offense may be subtle and psychological. See Eskridge. Nevertheless, the state must still prove all elements of gross sexual imposition beyond a reasonable doubt. Eskridge
at 59. A jury may consider all of the circumstances surrounding the sexual conduct in determining whether a defendant compelled sexual contact through force or threat of force. State v. Drayer,159 Ohio App.3d 189, 2004-Ohio-6120, at ¶ 5.
 {¶ 22} In this appeal, appellant limits his argument regarding the force element to the Christmas 1999 incident, during which M.C. told appellant "no" and walked upstairs, away from appellant and toward other people in the house. (Tr. at 72.) With respect to that incident, we agree that the record contains no evidence of force or threat of force.
 {¶ 23} The key in determining the existence of a force element is whether the victim's will was overcome by fear or duress. State v.Mitchell (June 13, 1991), Cuyahoga App. No. 58447, citing State v.Martin (1946), 77 Ohio App. 553; See Eskridge at 59. In Mitchell, the court considered a challenge to the force element of a gross sexual imposition conviction where the 13-year-old victim responded to unwelcome sexual contact by distancing herself from the defendant, her father. After asking his daughter to sit on his lap, the defendant kissed her, putting his tongue in her mouth, tickled her, put his hand up her skirt, touched her buttocks, and tried to pull her underwear down. The victim immediately jumped up, pulled her skirt down, and called her mother and sister to explain what had happened. The court of appeals reversed the defendant's conviction, stating:
* * * In the instant case, there was no evidence to show that the victim's will was overcome. The victim was not aware of what appellant intended to do until after the kiss and the hand touch of her buttocks. She immediately got up and went to call her mother, and nothing further happened. The state must prove beyond a reasonable doubt that force, threat of force or some form of coercion was used, even if it is by the circumstances of the case. Such evidence was not shown in the instant case and we cannot overlook it. * * *
Id. The court noted that the victim did not sit on her father's lap out of fear or coercion and found that the victim's testimony that she immediately got up and went to the phone indicated that she was not afraid or threatened.
 {¶ 24} In the instant case, no physical force or compulsion accompanied the Christmas 1999 incident. Appellant did not tell or command M.C. to do anything and did not threaten or restrain M.C. Appellant did not engage in any contact other than the sexual contact necessary for the offense itself. Appellant did not remove or displace M.C.'s clothing and did not hold or reposition M.C.'s body. Rather, according to M.C.'s testimony, appellant and M.C. simply found themselves alone together in the basement, and appellant reached out and touched M.C.'s breast over her shirt. Thus, the record contains no evidence of physical force relating to the Christmas 1999 incident.
 {¶ 25} The record also contains no evidence of contemporaneous subtle or psychological force or coercion with respect to the Christmas 1999 incident from which the jury could have determined that M.C.'s will was overcome by fear or duress. The record contains no evidence that fear or coercion led M.C. to be present in the basement with appellant. Although M.C. testified that she previously submitted to appellant's actions because he became moody if she refused and because he granted her more freedom if she submitted, the record contains no evidence that M.C.'s will was overcome, causing her to submit to appellant's actions, at the time of the Christmas 1999 incident. In fact, M.C. did not submit to appellant's actions during that incident. Instead, she told appellant "no" and immediately turned and went upstairs. (Tr. at 72.) The fact that M.C. rebuffed appellant and immediately distanced herself from him indicates that M.C. was not afraid or threatened by appellant at the time of the Christmas 1999 incident. See Mitchell. There is simply no evidence that M.C. was under the influence of any psychological force or coercion by appellant at the time of the Christmas 1999 incident.
 {¶ 26} The Christmas 1999 incident was an isolated event that occurred after a period of no sexual contact between appellant and M.C. Although appellant confines his argument regarding the sufficiency of the evidence to the Christmas 1999 incident, the record contains testimony concerning other instances of sexual contact between appellant and M.C. in 1999.
 {¶ 27} While questioning M.C. about the timing of the incidents of sexual contact between M.C. and appellant, the prosecutor elicited testimony that the series of sexual contacts that began in the summer of 1998 continued, albeit with less frequency, into 1999. On direct examination, M.C. testified as follows:
Q. Did this activity occur in 1999, the next year?
A. It was just in the summer for like — it was just like in the summertime. Like we went back to school. I was in school part of the time, but it still happened like once in awhile.
Q. During 1999?
A. Yes.
Q. Do you have any estimate as to how many times it might have happened in 1999?
A. I don't remember.
* * *
Q. Were there any incidents of the defendant touching you in 1999?
A. Yes.
(Tr. at 61-62.) M.C. also testified about the period of time prior to the Christmas 1999 incident during which no sexual contact occurred:
Q. And you were talking a little bit earlier, was there a time when this touching stopped?
A. Basically, like when school started, it like — it went on for a little bit after school had started, but school started and so I was at school, and then I'm not sure, but I think that's when he got his new job, so, yeah, like we weren't really home.
Q. Okay. Did — and are you referring to 1999 when school started?
A. Yes.
Q. And then you indicated that at a later time, something else happened. After everything had stopped for a time period, then did something else happen?
A. Around Christmas time is when —
Q. Of what year?
A. That was 19999 [sic].
(Tr. at 71.) Thus, M.C.'s testimony demonstrates that the Christmas 1999 incident, in which she finally refused appellant's advances, was not the sole sexual contact between appellant and M.C. in 1999.
 {¶ 28} In her closing argument, the prosecutor did not rely solely on the Christmas 1999 incident in support of the charge of gross sexual imposition in 1999. Instead, she reminded the jury of M.C.'s testimony that multiple incidents of sexual contact occurred in 1999. After describing the sexual contacts about which M.C. testified, the prosecutor argued, "[a]s far as the dates, she stated that these happened in the summer of '98 and onward through that year, and then she said that these things happened a few times in 1999." (Tr. at 283.) Later, the prosecutor reiterated:
[M.C.] testified it started in '98. Happened a few times in 1999. Then she stated one year in December, that that was the last time he touched her breasts, but this time she finally pushed him away and said no. * * *
(Tr. at 284). Nothing in the record indicates that the jury based its guilty verdict as to Count 1 of the 2004 indictment on the isolated Christmas 1999 incident rather than the earlier incidents of sexual contact in 1999.
 {¶ 29} The record contains sufficient evidence of psychological force with respect to the touching incidents, other than the Christmas 1999 incident, that continued from 1998 into 1999. Appellant and his wife exercised strict parental-like authority over M.C., who testified that appellant and Donna restricted her telephone calls, rarely allowed her to go out with her friends, and grounded her when she was in trouble. Because appellant was not working at the time, he was the sole authority figure at home while Donna was at work. Thus, appellant was in a position to discipline M.C. if she disobeyed him.
 {¶ 30} Other than the Christmas 1999 incident, each of the touching incidents occurred when M.C. and appellant were alone in the house. M.C. testified that appellant was controlling, that she was afraid of appellant, and that she felt compelled to acquiesce to appellant's requests. In contrast to M.C.'s response to the Christmas 1999 incident, during which other people were present in the house, the record contains no evidence that M.C. successfully refused appellant's prior advances in either 1998 or 1999. Rather, M.C. testified that she felt she really did not have a choice whether to submit.
 {¶ 31} Appellant warned M.C. not to tell her grandmother about his sexual contacts with M.C. because her grandmother "would kill him[.]" (Tr. at 68.) In Eskridge, the Supreme Court found "nothing unreasonable about a finding that the child's will was overcome" where a child is "told to do something by an important figure of authority, and commanded not to tell anyone about it." Eskridge at 59. Likewise, in State v.Rivas (July 28, 1993), Lorain App. No. 92CA005504, the court found sufficient evidence to support a finding of force where the defendant, who was convicted of raping his young daughter, ordered his daughter not to tell anyone that he was engaging in sexual relations with her.
 {¶ 32} M.C. testified that appellant's warnings not to tell Donna "didn't make [her] feel good because * * * they were people providing a house for me, and living with a family is better than living in a foster home, and that's where I would have been if I wasn't living with them[.]" (Tr. at 68.) In addition to providing M.C. a home and food, appellant and Donna provided M.C. with such items as clothing, a computer, a television, a stereo, and a clarinet to play in the school band. M.C. knew that, if she made allegations of sexual abuse, Children's Services would remove her from appellant's home. Thus, M.C. faced the threat of being removed from appellant and Donna's home, and placed into foster care if she told anyone about appellant's actions.
 {¶ 33} In addition to the relationship between appellant and M.C., their respective ages, appellant's position of authority over M.C., M.C.'s reliance on appellant for a place to live, and M.C.'s fear that she would be placed in foster care if anyone found out about appellant's actions, M.C. testified that appellant rewarded her when she submitted to his demands. Although appellant and Donna were strict in their authority over M.C., appellant gave M.C. more freedom if she submitted to his touching. M.C. testified that, after she complied with his demands, appellant would be more likely to allow her do things, such as to go to the next door neighbor's house or take a walk.
 {¶ 34} Considering all of the circumstances surrounding the sexual contacts between appellant and M.C., and viewing the evidence in a light most favorable to the prosecution, we find that the jury could reasonably conclude that M.C.'s will was overcome by fear and duress. Thus, we find that sufficient evidence supports the jury's finding of force or threat of force on Count 1 of the 2004 indictment. Therefore, we overrule appellant's assignment of error and affirm the judgments of conviction of the Franklin County Court of Common Pleas.
Judgments affirmed.
McGrath and Christley, JJ., concur.
[1] Pursuant to R.C. 2907.01(B), "sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."
[2] R.C. 2907.02 defines the offense of rape. Under R.C. 2907.02(B), a finding that the defendant purposefully compelled a victim less than 13 years of age to submit to sexual conduct by force or threat of force increases the penalty for the offense to life imprisonment.