JOURNAL ENTRY AND OPINION
{¶ 1} Defendant appeals his convictions by a jury on seven counts of rape in violation of R.C. 2907.02 and three counts of gross sexual imposition in violation of R.C. 2907.05. Defendant also appeals his eight-year term of imprisonment.[1]
 {¶ 2} The events giving rise to defendant's convictions occurred between August 2002 and January 2004. During that time, defendant became friendly with his teenage son's close friend, the victim in this case. Eventually, the victim relayed defendant's actions to others.
 {¶ 3} Following his arrest, defendant entered a plea of not guilty by reason of insanity. After numerous delays, defendant was found competent to stand trial. The jury found that defendant had raped the victim on seven different occasions in 2003. It also determined that defendant had committed the offense of gross sexual imposition against the victim three times in 2002.
 {¶ 4} Following his convictions and sentencing, defendant presents this timely appeal in which he presents twelve assignments of error, the first of which states:
Assignment of Error I:
THE UNDERLYING CONVICTIONS FOR RAPE ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE WHERE THE STATE OF OHIO FAILED TO OFFER ANY EVIDENCE REGARDING THE ESSENTIAL ELEMENT OF FORCE OR THREAT OF FORCE.
 {¶ 5} Defendant argues that his rape convictions are not supported by sufficient evidence on the element of force or threat of force.
 {¶ 6} "An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. A verdict will not be disturbed on appeal unless reasonable minds could not reach the conclusion reached by the trier of fact." State v.Watts, Cuyahoga App. No. 82601, 2003-Ohio-6480, citing State v.Jenks (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492. "Sufficiency is a test of adequacy." State v. Thompkins,78 Ohio St.3d 380, 386-387, 1997-Ohio-52, 678 N.E.2d 541." State v.Sims, Cuyahoga App. No. 84090, 2005-Ohio-1978, ¶ 6.
The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
State v. Jackson, Cuyahoga App. No. 86302, 2006-Ohio-2210, ¶ 28.
The crime of rape is defined in R.C. 2907.02(A)(2) as follows:
No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.
With regard to the rape of an adult person, the element of "force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A). "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." State v. Schaim), 65 Ohio St.3d 51, 1992-Ohio-31,600 N.E.2d 661, paragraph one of the syllabus.
 {¶ 7} In the case at bar, defendant argues that the trial court did not follow the definition of "force" expressed in R.C.2901.01(A). Rather, the trial court erroneously allowed the state to establish the element of "force" in this case under what defendant claims are the "more relaxed" standards set forth inState v. Eskridge (1988), 38 Ohio St.3d 56, 526 N.E.2d 304, andState v. Dye (1998), 82 Ohio St.3d 323, 695 N.E.2d 763.
 {¶ 8} In 1985, three years before Eskridge was decided, this court provided part of the definition of "force" used later in Eskridge. In State v. Fowler (1985), 27 Ohio App.3d 149,500 N.E.2d 390, a stepfather repeatedly raped his stepdaughter over a course of years. The indictment charged Fowler with four counts of raping his stepdaughter when she was under the age of thirteen. The indictment also charged him with two other counts of raping his stepdaughter when she was over the age of thirteen.
 {¶ 9} In Fowler, this court, acknowledging the parental role defendant occupied in the victim's life, did not distinguish between the time when the victim was under thirteen and when she was thirteen and fourteen. This court applied the same definition of "force" for all defendant's rape charges:
Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established. State v. Martin (1946),77 Ohio App. 553 [33 O.O. 364]; State v. Wolfenberger (1958),106 Ohio App. 322 [7 O.O.2d 73].
 {¶ 10} In Eskridge the four-year-old victim was raped by her twenty-eight-year-old father. Because of the tender age of the victim and the parental relationship that existed between her and the defendant, the Court determined:
The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength.
Id., at 59, citing Fowler at 154.
 {¶ 11} Ten years after Eskridge was decided, the Ohio Supreme Court expanded that case's definition of "force" to include an adult male who was not a parent or stepparent. InDye, an adult male raped a child under age thirteen. The defendant was a friend and neighbor of the child's mother. The Court used the same definition of force as in Fowler andEskridge. The Court determined that even though the defendant was not the child's father or a parental figure, he nonetheless occupied "a position of authority" and, therefore, could be convicted of raping that child "with force pursuant to R.C.2907.02(A)(1)(b) * * * without evidence of express threat of harm or evidence of significant physical restraint." Id. at 326.
 {¶ 12} We also find the analysis in State v. Musgrave (Nov. 25, 1998), Summit App. No. 18260 persuasive. In that case, the court concluded that
the alleged victims — J.M. and M.P. — were thirteen years old at the time of the alleged incidents and, arguably, would not be covered by the specific holding in Dye. Based on the reasoning underlying that holding, however, this Court concludes that the element of force, even when the alleged victim is at least thirteen years old, may be proven by that same standard. What mattered in Dye was that the defendant occupied a position with respect to the child that allowed him to be able to exert force by subtle and psychological means: he was a trusted family friend, he was bigger and older than the child, and was in charge of the child during the visits at defendant's home. This Court holds, therefore, that, if the alleged victim is a minor child, evidence of subtle and/or psychological force may be sufficient to support conviction of an accused who is an authority figure to that child, even in the absence of any express threat of harm or significant physical restraint. See id. The jury instruction given by the trial court on the issue of force was not incorrect.
Id., 1998 Ohio App. LEXIS 5557, *8-*9.
 {¶ 13} In the case at bar, defendant argues that the definition of "force" applied in Eskridge and Dye does not apply to the acts he committed against the victim in this case, because he was thirteen when the sexual conduct occurred. According to defendant, the state should have been required to prove that he used "actual force" against the victim. Defendant's brief on appeal, at 14. Defendant urges us to apply the definition of "force" used in State v. Schaim (1992),65 Ohio St.3d 51, 600 N.E.2d 661, in which the Court distinguished the element of "force" defined in Eskridge from a case in which the victim was an adult female, age 20. The Court stated:
A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit. * * * (State v. Eskridge [1988], 38 Ohio St.3d 56, 526 N.E.2d 304, distinguished.)
Id., at syllabus.
 {¶ 14} In the case at bar, we decline to use the definition of "force" applied in Schaim because the victim in that case was an adult. Here, the victim was not an adult when he was sexually assaulted. He was a minor and still considered a child. The victim was not of so tender an age, however, as the children in Eskridge and Dye. Therefore, the question is whether his will was overcome by fear or duress.
 {¶ 15} "In determining whether a course of conduct results in duress, the question is not what effect such conduct would have upon an ordinary man but rather the effect upon the particular person toward whom such conduct is directed, and in determining such effect the age, sex, health, and mental condition of the person affected, the relationship of the parties and all the surrounding circumstances may be considered." Id., citing Statev. Woods (1976), 48 Ohio St.2d 127, 135-136, 357 N.E.2d 1059, overruled in part, on other grounds, by State v. Downs (1977),51 Ohio St.2d 47, 364 N.E.2d 1140, paragraph one of the syllabus.
 {¶ 16} In the case at bar, the victim testified that he and the defendant's son, "C," had become friends at the beginning of the seventh grade. The victim was thirteen at the time. "C" had a pool in his backyard and the boys would gather frequently for pool parties.
 {¶ 17} In August 2002, the victim and defendant first met when "C" was having one of his parties. At defendant's house, the victim learned that his best friend had suddenly died while swimming at a public pool. According to the victim, that day and for days thereafter, defendant comforted him by buying him things,[2] giving him money, and taking him places. When the defendant took "C" and the victim places, "[h]e would sit there and play with us. He would take us a bunch of places, laser tag, pool. * * * He would stay with us and play." Tr. 298. Between August and December 2002, the victim slept at the defendant's house numerous times for sleepovers with "C." The victim typically slept on a couch in the defendant's living room. According to the victim, defendant touched his genitalia and pubic area at least three different times. The victim gave the following testimony:
Q: And when he was touching your penis when talking to you, what did you do?
A: I was worried, scared.
Q: What do you mean, "worried, scared"?
A: Afraid to even be there.
Q: Well, why is that?
A: `Cause I — it's never happened to me. I'd never even been touched by a girl at that time, and —
Q: Well, when you slept over, was ["C"'s] mom and dad in charge of you when you were there?
A: Yes.
* * *
Q: Were you able to push him away?
A: No.
Q: Why not?
A: He's a lot bigger than I am.
* * *
Q: Was he talking to you when he was doing this to you?
A: Yes.
Q: What was he saying to you?
A: The first few times he wasn't really talking to me. He was just doing his own thing, that he wanted to do. And then after he was, felt like he was done, he would sit there and talk to me how he screwed up and how bad his life was and how he felt.
Q: So he started to talk about how bad his life was —
A: Yes.
Q: — after he did this to you?
A: Yes.
Q: What did you say?
A: I was speechless.
Q: Did you scream?
A: No.
Q: Did you kick him?
A: No.
Q: Did you tell his wife?
A: No.
Q: Did you tell his son, ["C"]?
A: No.
Q: Did you tell your mom and dad?
A: No, I did not.
Q: Why not?
A: Too embarrassed.
Q: You were embarrassed?
A: Yes.
Q: Did he say anything to you about if you said anything or did anything or told anybody?
A: No. He did take — I'm guessing he took one of ["C's"] address books and wrote down a lot of people's names that I was friends with.
Q: Yes.
A: And wrote them letters saying what happened.
Q: He did that or he showed you that?
A: He showed me the letters that he had. He had about 20 of them.
Q: And these were letters he wrote?
A: Yes. Yes.
Q: And what did the letters say?
A: I did not get to read them because they were already in their envelopes.
Q: What did he say was in the letters?
A: He just said that it was every thing. He said that it was telling them what had happened.
Q: How did that make you feel?
A: Pretty angry.
Q: Angry?
A: Yes.
Q: Were you embarrassed?
A: Yes.
Q: Were you scared?
A: Yes.
Tr. 303-308.
 {¶ 18} The victim further testified that there were seven to eight occasions in 2003 when he was sleeping on the couch at defendant's house and he would awake to find defendant sucking on his penis. The victim stated that, although he asked defendant to stop, defendant continued until the victim ejaculated.
 {¶ 19} The victim explained that, after each incident, defendant would apologize and promise to leave him alone. Defendant bought the victim numerous gifts and tried to show him how to do furnace repair work.
 {¶ 20} The victim stopped going to defendant's house in January 2004. Defendant would attempt to contact the victim by e-mail, sometimes up to 15 times per day. In several e-mails, the defendant threatened to kill himself if he could not reconcile with the victim. The victim read some of the defendant's e-mails out loud from the witness stand:
Q: Okay. * * * can you read this next page, if you can follow along?
A. Right here?
Q. On the bottom right here, yes.
A. "If you don't have time to talk to me online, at least answer. If you break my heart anymore than you already have, I'm just going to die. In your name I will show you what you mean to me and end my life, and it will be on your —" there's just a "d" there.
Q. Okay.
A. "My blood will be on your hands. Someone, maybe you, maybe your parents, will you come out one morning and see me laying there dead. This I promise you. I will kill myself for you and show you what you mean to me, * * *. I can guarantee this to you. As sure as you — as sure as tomorrow will come, I swear I will do this. Is this what you want?"
Q. Okay. Are you okay?
A. Yeah.
Q. And this one, Please.
A. "I told you I couldn't live without you in my life. I provided too many times — proved to you too many times how much I cared about you. What you did for my heart no one else could ever do. I thank you for that.
"I will be forever grateful for all the fun times we shared. That's why I always tried to do more for you. I guess I tried too hard and pushed you away. I'm sorry for that. I just wish you wouldn't — would've realized that.
"I never wanted you to hate me. Now I guess you do. Now I hate myself for that. Please remember the good time I tried to give you and the good in me. I never meant to hurt you in any way. I hope you believe that.
"Please stop getting high and stuff for me, please. That's what I wanted to talk to you about, between having a real fucked up childhood and constantly getting beat up by my parents and getting high, that's how I lost my youth.
"I only got you that stuff and almost killed myself by getting high with you so maybe it would make you not do it anymore. That way you wouldn't lose your childhood like I did, because I never want you to feel inside how I feel.
"Every day I want to take my life because I can't take it no more. You kept me here longer than I had planned, thanks, but now I don't know if even you can keep me here anymore.
"You won't give me what I need from you, the only thing in this whole world that I want more than anything, your heart.
"Well, I will give you a week to reply to this, and if you don't reply after reading this, then I guess I have no other choice. Thanks for being my friend and for what you did for my heart.
"I will never forget you, * * *. You were and always will be my best friend. Remember to always stay young at heart so your youth will never die.
"Oh yeah. And always remember I will always love you for what you did for my heart. You did a good thing for me. Please have a good life.
"Reply. Turkey."
Q. Who is Turkey?
A. (Indicating.)
Q. * * *, when you were receiving these e-mails that you just read, was this after you said, "I'm not going over there anymore and getting this done"?
A. I believe so.
Q. When he's e-mailing you, are you responding to these e-mails?
A. Not at that point, no.
Q. What were you thinking when you're reading that?
A. I believe I only read one of those. I believe I only read a few of them.
Q. Do you recall reading that one?
A. Yes.
Q. What were you thinking when you read that?
A. I didn't know why this had happened to me, and I didn't know why he would choose me. I didn't do anything to disrespect him in any way. I didn't show him any signs of me being that kind of person.
He had — you know, one of the e-mails that are not there, he had called me and/or he had said that he thought I was bisexual, which I'm obviously not. I was just angry.
Q. Did you want him to perform oral sex on you, * * * ?
A. No, I did not.
Q. Did you say, "Okay. Let's — you can do this"?
A. No.
Q. Why did you let him do it to you?
A. I'm not a very big kid to have any kind of force or anything. I have no authority over anything.
Tr. 331-335.
 {¶ 21} The victim described what the events had done to him after he had no more contact with defendant. He stated that he felt disrespected and embarrassed and had thought of suicide.
 {¶ 22} From this record, we conclude that there was evidence that, on at least one occasion, the defendant did physically force himself on the victim while he was asleep. The victim stated that he awoke finding defendant orally stimulating his penis. See State v. Sullivan (Oct. 7, 1993), Cuyahoga App. No. 63818, 1993 Ohio App. LEXIS 4859, at *9-*10. On the other occasions when defendant raped the victim, the defendant kept his mouth on his penis until he ejaculated. Even when the victim told the defendant to stop, defendant did not desist.
 {¶ 23} We underscore that at the time of the subject events, the defendant was 40 years old. We also note that the victim and "C" were very close friends who spent much time together. As "C's" father, defendant was undoubtedly an authority figure. There was also a disparity in size and strength between the victim and the defendant. The victim further testified that he first met defendant the day he learned his best friend had died. Defendant used the victim's shock and grief to begin establishing a sympathetic relationship with him. Then, in order to solidify that bond, defendant started giving the victim gifts and money and took him places.
 {¶ 24} After the events in 2002 and 2003, defendant threatened to mail letters addressed to his friends detailing what the two of them had been doing. The victim was afraid his friends would not only find out, but they would think he was homosexual. Defendant's sexual conduct continued.
 {¶ 25} All told, defendant, as a person of authority in the victim's life, manipulated the victim by using subtle and not so subtle psychological force. The defendant further controlled and manipulated the victim by apologizing after each event, promising it would not happen again, and then verbally degrading himself as a bad person who needed the victim's sympathy and forgiveness. When we evaluate all the circumstances surrounding the sexual conduct defendant foisted upon the victim, and when we view the evidence in a light most favorable to the prosecution, we conclude that the jury could reasonably conclude that the victim's will was overcome by fear and duress. Accordingly, we conclude that sufficient evidence supports the jury's finding that defendant used force when he raped the victim. Defendant's first assignment of error is without merit.
Assignment of Error II:
THE UNDERLYING CONVICTIONS FOR GROSS SEXUAL IMPOSITION ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE WHERE THE STATE OF OHIO FAILED TO OFFER ANY EVIDENCE REGARDING THE ESSENTIAL ELEMENT OF FORCE OR THREAT OF FORCE.
 {¶ 26} Defendant argues that his convictions for gross sexual imposition are not supported by sufficient evidence on the element of force or threat of force. We disagree.
R.C. 2907.05(A) defines the offense of gross sexual imposition as follows:
No person shall have sexual contact with another, not the spouse of the offender * * * when * * *:
(1) The offender purposely compels the other person * * * to submit by force or threat of force.
R.C. 2907.05(A)(1). "Sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).
 {¶ 27} The force element needed to prove the offense of gross sexual imposition is the same as it is for rape. State v.Riggs, Franklin App. Nos. 04AP-1279 and 04AP-1280,2005-Ohio-5244, ¶ 20, citing Musgrave, supra, at *17 and Statev. Dooley, Cuyahoga App. No. 84206, 2005-Ohio-628, ¶ 27. In the case at bar, we have already determined that the definition of "force" used in Fowler, Eskridge, Dye and Musgrave, is the proper one to apply in this case. The victim testified that defendant touched his pubic area and/or his genitals on at least three occasions in 2002. The victim described what occurred:
Q: All right. Now, in that 2002 time frame, August, September, October, November, December, when you slept over the house in that time frame, can you tell the ladies and gentlemen while you were sleeping what happened in that time frame?
A: He would come down from upstairs, and I'd be sleeping, and he would kneel next to the couch, either wake me up by touching me or talking.
Q: Okay. You said touching you?
A: Yes.
Q: Where would he be touching you when he woke you up?
A: Down by my pubic area.
Q: In your pubic area?
A: Yes.
Q: Can you tell us where? Was it your penis?
A: Yes.
Q: Would he touching your penis?
A: Yes.
* * *
Q: And what would he be doing with his hand?
A: He'd be touching either my penis or my pubic area.
Q: How many times did that happen in 2002?
A: Three times; three, four times.
Q: All right. Did he just touch or did he do anything more to you?
A: He would masturbate me.
Q: Masturbate you?
A: Yes.
Q: Can you tell us specifically how he masturbated you?
A: To ejaculation.
Q: Well what did he do with his hand?
A: He would — I don't understand what you mean.
Q: Well, what did his hand do? It was on your penis, right?
A: Yes.
Q: And what would he be doing with his hand?
A: He would keep stroking it and going up and down.
 {¶ 28} When we view the evidence in a light most favorable to the prosecution as we did in defendant's first assignment of error, we conclude that the jury could reasonably conclude that defendant used psychological force of varying types and degrees in order to obtain what he wanted from the victim. We, therefore, conclude that the victim's will was overcome by fear and duress.
 {¶ 29} Accordingly, we conclude that sufficient evidence supports the jury's finding that defendant used force when he committed the three offenses of gross sexual imposition against the victim. Defendant's second assignment of error is overruled.
Assignment of Error III:
THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT PROVIDED THE JURORS WITH THE WRONG DEFINITION OF "FORCE."
 {¶ 30} Defendant argues that the trial court erred when it used the wrong definition of force in its instructions to the jury.
 {¶ 31} Because defendant did not object to any of the trial court's jury instructions, he has, therefore, waived all but plain error. See Crim.R. 52(B); State v. Barnes),94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240.
 {¶ 32} "[P]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Id. "To constitute plain error, the error must be obvious on the record, palpable, and fundamental, so that it should have been apparent to the trial court without objection." State v. Marinello, Cuyahoga App. Nos. 86028 and 86113, 2006-Ohio-282, ¶ 40. Defendant must demonstrate that, but for the trial court's action, the outcome of the trial clearly would have been different. Id., citing State v. Waddell),75 Ohio St.3d 163, 166, 1996-Ohio-100, 661 N.E.2d 1043. "Notice of plain error is to be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." Marinello, supra, citing State v. Phillips),74 Ohio St.3d 72, 83, 1995-Ohio-171, 656 N.E.2d 643.
 {¶ 33} In the case at bar, as he argued in his first two assignments of error, defendant claims that the court used the wrong definition of "force" when it instructed. The trial court defined the element of "force" as follows:
It means any violence, compulsion or constraint physically exerted by any means upon or against another person.
There is a special situation here because of the status of the defendant and the age of the victim.
When there exists a relationship between the victim and the defendant, and if it is one of child and parent or person who is in the place of the parent, the element of force need not be openly displayed or physically brutal. The force can be subtle, slight, psychological or emotionally powerful.
Evidence of an express threat of harm or evidence of significant physical restraint is not required under this circumstance.
If you find beyond a reasonable doubt that under the circumstances in evidence the victim's will was overcome by fear or duress or intimidation, the element of force has been proven.
Threat means a direct or indirect threat. The prosecution need not prove that the victim physically resisted the defendant.
Tr. 787-788.
 {¶ 34} In State v. Musgrave (Nov. 25, 1998), Summit App. No. 18260 1998 Ohio App. LEXIS 5557, the court reviewed a jury instruction[3] on the element of "force" virtually identical with the "force" instruction in this case. That instruction comports with the definition of "force' applied inFowler, Eskridge and Dye as well. Accordingly, we find no error, plain or otherwise, in the trial court's instruction to the jury. Defendant's third assignment of error is overruled.
Assignment of Error IV:
THE TRIAL COURT ERRED IN PROVIDING THE ESKRIDGE DEFINITION OF FORCE WHERE THE APPELLANT WAS NOT A PARENTAL FIGURE OF [sic] IN A POSITION OF AUTHORITY AS SET FORTH IN ESKRIDGE.
 {¶ 35} Defendant argues that the definition of "force" applied in Eskridge cannot apply to him because he was not a parental figure in the victim's life. We disagree.
 {¶ 36} The definition of "force" used in Fowler, Eskridge,Dye and Musgrave is not limited to parental figures. In particular, in Dye and Musgrave, neither of the defendants were parents or stepparents to their victims. Nonetheless, the courts in those cases determined that proof of force used by the defendant did not have to be shown by physical restraint. Defendant further argues that it was error for the court, rather than the jury, to determine that defendant was in a position of authority over the victim.
 {¶ 37} As those cases demonstrate, however, the determination of whether the term "force" should be applied in a particular case is not a factual determination for a jury. Accordingly, this assignment of error lacks merit.
Assignment of Error V:
TRIAL COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO OBJECT TO THE DEFINITION OF "FORCE" AS DEFINED FOR THE JURORS.
 {¶ 38} Defendant argues that he received ineffective trial counsel because his lawyer did not object to the definition of force applied in this case.
 {¶ 39} In order to substantiate a claim of ineffective assistance of counsel, the appellant is required to demonstrate that: 1) the performance of defense counsel was seriously flawed and deficient; and 2) the result of the appellant's trial or legal proceeding would have been different had defense counsel provided proper representation. Strickland v. Washington
(1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v.Brooks (1986), 25 Ohio St.3d 144, 25 Ohio B. 190,495 N.E.2d 407.
 {¶ 40} In the case at bar, since we have already determined that the correct definition of "force" was applied in this case, trial counsel would have had no basis upon which to make an objection. Accordingly, defendant did not receive ineffective trial counsel. Defendant's fifth assignment of error is overruled.
Assignment of Error VI:
TRIAL COUNSEL WAS INEFFECTIVE FOR IMPLORING THE JURORS TO FIND THE APPELLANT GUILTY.
 {¶ 41} Defendant argues that his trial attorney was ineffective because he asked the jury to convict defendant of a lesser included offense.
 {¶ 42} "In reviewing a claim of ineffective assistance of counsel, it must be presumed that a properly licensed attorney executes his legal duty in an ethical and competent manner."Marinello, ¶ 49, citing State v. Smith (1985),17 Ohio St.3d 98, 17 Ohio B. 219, 477 N.E.2d 1128. Even debatable tactics do not constitute ineffective assistance of trial counsel. State v.Clayton (1980), 62 Ohio St.2d 45, 49, 402 N.E.2d 1189.
 {¶ 43} In the case at bar, defendant's argument focuses on his counsel's following comments:
* * * And what I'm suggesting to you is that at some point this got too heavy for * * *, he couldn't deal with it anymore, and he saw a way out of it, and here we are. But does that equal force or rape? I submit to you it doesn't. Does it equal unlawful sexual activity with a minor? I submit to you it probably does.
Tr. 754. After closing arguments, the trial court instructed the jury on the lesser included offense of unlawful sexual conduct with a minor.
 {¶ 44} From the record in this case and the evidence adduced at trial, we do not conclude that defendant received ineffective trial counsel. Defendant's lawyer argued for his client's innocence on the charge of rape. He did so by providing the jury with an alternative. Defense counsel made a strategic trial decision: to argue for a conviction on a lesser included offense.
 {¶ 45} Despite the trial court's instruction on the lesser offense of unlawful sexual conduct, the jury convicted defendant of rape nonetheless. Accordingly, it cannot be said that but for defense counsel's tactic, the outcome of defendant's trial would have been different. That would be the case only if the jury had convicted defendant on seven counts of unlawful sexual conduct with a minor rather than the seven counts of rape he was convicted on.
 {¶ 46} Defense counsel was not ineffective and defendant's sixth assignment of error is overruled.
Assignment of Error VII:
THE STATE FAILED TO PROVE "BY CLEAR AND CONVINCING EVIDENCE" THAT APPELLANT "IS LIKELY TO ENGAGE IN THE FUTURE IN ONE OR MORE SEXUALLY ORIENTED OFFENSES."
 {¶ 47} Defendant argues that he should not have been classified as a sexual predator pursuant to R.C. 2950.01 et seq.
 {¶ 48} "In order to be classified as a sexual predator, a defendant must have been convicted of or pled guilty to committing a sexually oriented offense. The state then `must prove by clear and convincing evidence that the offender is "likely to engage in the future in one or more sexually oriented offenses."'" State v. Hayes, No. 83515, 2004-Ohio-4491, ¶ 6, citing State v. Namestnik, Cuyahoga App. No. 82228, 2003-Ohio-4656, at ¶ 7, quoting State v. Eppinger,91 Ohio St.3d 158, 163, 743 N.E.2d 881, 2001-Ohio-247, citing R.C. 2950.01(E)and 2950.09(B)(3).
Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.
Id., ¶ 7, citng Namestnik, ¶ 8.
 {¶ 49} In determining whether a defendant is a sexual predator, the trial court must consider certain factors set forth in R.C. 2950.09(B)(3). Those factors include the following:
(a) The offender's or delinquent child's age;
(b) The offender's or delinquent child's prior criminal or delinquency record regarding all offenses, including, but not limited to, all sexual offenses;
(c) The age of the victim of the sexually oriented offense for which sentence is to be imposed or the order of disposition is to be made;
(d) Whether the sexually oriented offense for which sentence is to be imposed or the order of disposition is to be made involved multiple victims;
(e) Whether the offender or delinquent child used drugs or alcohol to impair the victim of the sexually oriented offense or to prevent the victim from resisting;
(f) If the offender or delinquent child previously has been convicted of or pleaded guilty to, or been adjudicated a delinquent child for committing an act that if committed by an adult would be, a criminal offense, whether the offender or delinquent child completed any sentence or dispositional order imposed for the prior offense or act and, if the prior offense or act was a sex offense or a sexually oriented offense, whether the offender or delinquent child participated in available programs for sexual offenders;
(g) Any mental illness or mental disability of the offender or delinquent child;
(h) The nature of the offender's or delinquent child's sexual conduct, sexual contact, or interaction in a sexual context with the victim of the sexually oriented offense and whether the sexual conduct, sexual contact, or interaction in a sexual context was part of a demonstrated pattern of abuse;
(i) Whether the offender or delinquent child, during the commission of the sexually oriented offense for which sentence is to be imposed or the order of disposition is to be made, displayed cruelty or made one or more threats of cruelty;
(j) Any additional behavioral characteristics that contribute to the offender's or delinquent child's conduct.
 {¶ 50} "On appeal, this court must decide whether the record supports, by clear and convincing evidence, the trial court's determination that a defendant should be classified as a sexual predator." Hayes, supra, ¶ 21.
 {¶ 51} In the case at bar, the facts the trial court considered do not amount to clear and convincing evidence that defendant is more likely than not to sexually re-offend in the future. The trial court considered six of the ten factors listed in R.C. 2950.09(B)(3). The court reviewed defendant's psychiatric report, which assessed him as a "low to medium risk to re-offend." Defendant was 42 at the time of the offenses while the victim was only 14. Defendant suffers from "major depression, post-traumatic stress disorder, dissociative disorder as well." The court further determined that defendant's conduct demonstrated a pattern of abuse against the victim since he molested the victim over a period of time. One can further conclude that defendant preyed on the victim's psyche and emotions by threatening to kill himself and to expose the victim to his friends. The record clearly demonstrates that the defendant abused the position of authority he held over the victim.
 {¶ 52} After considering all the foregoing factors, the court concluded that defendant should be classified as a sexual predator. We disagree with the conclusion of the trial court. We do not find clear and convincing evidence that defendant, after he has served his prison time, is more likely than not to sexually re-offend in the future.
 {¶ 53} While we do not condone any part of defendant's crimes against the victim, we, nonetheless, cannot conclude that defendant's potential for committing sexual offenses has been clearly and convincingly established. At the time of the offenses, defendant had been married for 23 years and had children of his own. He was a 40 year-old male who had recently confronted his own history of sexual abuse as a child.
 {¶ 54} Defendant testified that at the time of the subject offenses, he was depressed and having a difficult time coping with his own sexual abuse as a child. Despite his various mental health issues, defendant was not on any type of medication at the time of the offenses in this case. We do find troubling, however, defendant's refusal to accept any responsibility in this case. At all times, defendant has denied the offenses he was convicted of committing.
 {¶ 55} Defendant scored in the "medium-low risk" category on the Static-99 assessment test.[4] As noted by the trial court, the medium-low risk category means that a person who scores in this section has a 9% chance of re-offending within 5 years, a 13% chance of re-offending in 10 years, and a 16% chance within 15 years. See, State v. Hayes, Cuyahoga App. No. 83515,2004-Ohio-4491, ¶ 22, fn. 1.
 {¶ 56} In prison, defendant will have the opportunity to receive needed mental health and other psychological counseling. He will also be prescribed needed medication. Should he participate in a rehabilitation program and remain on medication, we cannot predict whether, after prison, he will go on to commit sexual offenses in the future.
 {¶ 57} Accordingly, we conclude the trial court erred in finding that defendant was likely to commit sexual offenses in the future. The court's classification of defendant as a sexual predator is, therefore, vacated. Defendant's seventh assignment of error is sustained.
Assignment of Error VIII:
THE TRIAL COURT ERRED IN FAILING TO MAKE A FINDING REGARDING THE APPELLANTS STATUS AS A POTENTIAL HABITUAL SEXUAL OFFENDER.
 {¶ 58} Defendant argues that the trial court erred in failing to determine whether he is a habitual sex offender pursuant to R.C. 2950.09(E). According to the statute,
when an individual has been convicted of or pleaded guilty to a sexually oriented offense, the judge must make a finding regarding the offender's status as a habitual sex offender. This finding must be expressly made regardless of whether the offender was already adjudicated as a sexual predator, and, although the habitual sex offender finding will have no impact on the registration requirements after a sexual predator determination, the statute, nonetheless, mandates such a finding.
State v. Othberg, Cuyahoga App. No. 83342, 2004-Ohio-6103, ¶ 20.
 {¶ 59} In the case at bar, the trial court did not determine whether defendant is a habitual sex offender. Accordingly, we remand this matter to the trial court to make that determination. Defendant's eighth assignment of error is sustained.
Assignment of Error IX:
THE TRIAL COURT ERRED IN SENTENCING MR. MILAM TO A TERM OF INCARCERATION BEYOND THE MINIMUM WHERE MR. MILAM NEVER SERVED [sic] A PRIOR TERM OF INCARCERATION AND THE FACT WAS NOT FOUND BEYOND A REASONABLE DOUBT BY A JURY.
 {¶ 60} Defendant argues that the trial court erred in sentencing him to more than the minimum three-year term of incarceration for his crimes.
 {¶ 61} R.C. 2929.14(B)(2) provides that the trial court must impose the minimum sentence on an offender who has not previously served a prison term, unless the court finds one of the following on the record: (1) "that the shortest prison term will demean the seriousness of the offender's conduct" or (2) "will not adequately protect the public from future crime by the offender or others." R.C. 2929.14(B)(2).
 {¶ 62} Recently, R.C. 2929.14(B) has been declared unconstitutional and excised from the statutory scheme by the Ohio Supreme Court in State v. Foster,
109 Ohio St.3d, 2006-Ohio-856, ¶¶ 1-4, applying United States v. Booker (2005),543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621; Blakely v.Washington (2004), 542 U.S. 296, 124 S.Ct. 2531,159 L.Ed.2d 403; and Apprendi v. New Jersey (2000), 530 U.S. 466,120 S.Ct. 2348, 147 L.Ed.2d 435.
 {¶ 63} Following Foster, this court has determined that "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." State v. Woods, Cuyahoga App. No. 86664, 2006-Ohio-2089, ¶ 4 citing Foster, at ¶ 7 of the syllabus and State v. Mathis, Ohio St.3d, 2006-Ohio-855, ¶ 3 of the syllabus.
 {¶ 64} In the case at bar, defendant was sentenced under unconstitutional and now void statutory provisions; therefore, he must be resentenced. Accordingly, defendant's ninth assignment of error is sustained, but not for the reasons defendant recited. We hereby vacate defendant's sentence and remand this matter to the trial court for resentencing.
Assignment of Error X:
APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL, BY COUNSEL'S FAILURE TO KEEP IMPROPER VICTIM IMPACT TESTIMONY OUT OF THE TRIAL.
 {¶ 65} Defendant argues that his trial counsel was ineffective for allowing the admission of objectionable victim-impact testimony. We have already discussed the standard for determining whether trial counsel has been ineffective. See, discussion supra, at 21. In the case at bar, defendant complains that his trial counsel should have objected when the jury was allowed to hear inflammatory victim-impact evidence. Victim-impact testimony describes a victim's suffering or otherwise elicits sympathy and bias from a jury. Insofar as such testimony has no probative value, it is inadmissible. State v.Skatzes, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 213,819 N.E.2d 215. Typically, such evidence is deemed too prejudicial and not relevant pursuant to Evid.R. 403. Id.
 {¶ 66} Evid.R. 403(A) provides:
(A) Exclusion mandatory. — Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
 {¶ 67} In the case at bar, defendant argues that the following testimony was inadmissible because it concerned statements about the victim from his former girlfriend. The girlfriend testified as follows:
Q: Can you tell the ladies and gentlemen how he is today compared to before this came out?
A: Before he was-he was quite, he never really said anything that went on, that happened, and now all-like now he's very friendly and does-like he'll say what he has to say. He won't keep it from anybody else.
Tr. 465.
 {¶ 68} His attorney objected to the first instance of victim-impact testimony, and, thus, we review the admission of this testimony under an abuse of discretion standard. See Statev. Maurer (1984), 15 Ohio St.3d 239, 265, 15 OBR 379,473 N.E.2d 768. Because the statement is not probative of defendant's guilt, it should not have been admitted. The trial court, therefore, abused its discretion in allowing the testimony.
 {¶ 69} The next set of statements were not objected to by defense counsel. Accordingly, the plain error standard of review applies. State v. Marinello, Cuyahoga App. Nos. 86028 and 86113, 2006-Ohio-282, ¶ 40. "[P]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Id. "To constitute plain error, the error must be obvious on the record, palpable, and fundamental, so that it should have been apparent to the trial court without objection." Id. Defendant must demonstrate that, but for the trial court's action, the outcome of the trial clearly would have been different. Id. The state posed the following questions to the victim's mother:
Q: Mrs. * * *, can you tell the ladies and gentlemen how this-what has happened to your son, how this has affected you and your family?
A: [He's] a different kid.
Q: He is a different kid now?
A: Yes.
Q: Can you explain? How is he different?
A: He gets upset easy. I see a difference in his attitude.
Anytime that we've had to make arrangements to come to court or any of this gets brought up, he doesn't want to talk about it. He just wants to try and put this behind him.
When we went to school, after this all happened, the kids at school made fun of him, calling him a fag and calling him queer, starting fights with him, spreading rumors around school.
One kid even took the paper and apparently spent a good deal of money on it and put it all over the school and taped it up on lockers.
One kid was in class calling him all kinds of things.
My older daughter, even though it was probably not the thing to do, nailed the kid because they kept calling my son a fag.
Q: Mrs. * * *, is your son gay?
A: No, sir.
Tr. 521-522.
The state also elicited testimony from the victim's father:
Q: Okay. Have you seen a change in your son —
A: Yes.
Q: Since this has happened?
A: Yes.
Q: Can you tell the ladies and gentlemen of the jury what that change is?
A: We were pretty close. We do a lot of things together. Now its like, "I don't feel like it, Dad. I don't want to do nothing." It's kind of just, I don't know, he's wayward. I don't know how to say it any other way, you know.
Q: He's what?
A: Wayward. He's kind of like * * * in his own domain, you know.
Q: Okay.
A: He don't feel like doing things.
Tr. 550-551. The victim's father stated that he had liked defendant.
 {¶ 70} The victim also testified and told the jury that he did not want to be in court testifying about what happened. He explained that he felt bad when his school peers found out about what had occurred and that some of them called him a liar.
 {¶ 71} One of the detectives on the case was asked whether defendant had shown any remorse for his conduct. The detective's response is as follows:
* * * again it's my speculation, but I — there was a feeling that there was some wrong doing there in his mind at the time, that he wanted to right that by killing himself.
Tr. 588.
 {¶ 72} In the case at bar, the state claims that victim-impact testimony is admissible so long as it is "not overly emotional or directed to the penalty to be imposed." State's Brief on Appeal, 19, citing State v. Reynolds (1998),80 Ohio St.3d 670 and State v. Smith (2002), 97 Ohio St.3d 367.
 {¶ 73} We reject the state's position on the admissibility of victim-impact statements especially when both Reynolds andSmith involved the admissibility of such statements only during the penalty/sentencing phase of a defendant's trial, not the guilt phase as in the case at bar.
 {¶ 74} Moreover, whether victim-impact testimony is "overly emotional" is not the relevant question when such evidence is admitted during the guilt phase of a defendant's trial. The only question is whether such testimony has any probative value.Skatzes, supra, ¶ 213. If not, it is inadmissible because it is too prejudicial and not relevant. Id.; Evid.R. 403.
 {¶ 75} In the case at bar, we agree with defendant that the cited victim-impact statements should not have been admitted. The victim's mother's comments served solely to describe the humiliation her son went through as a result of defendant's misconduct. That her son's peers made fun of him and called him derogatory names highlights the emotional impact the events had on the victim. Those same events, however, do nothing to assist the trier-of-fact in determining defendant's guilt.
 {¶ 76} The statements of the victim's father are not probative of defendant's guilt either. The father told the jury that since the subject events, his son seemed "wayward" and not interested in doing things. These statements explain how depressed and removed the victim became, but they do not have any bearing on whether defendant committed rape and gross sexual imposition against the victim. Defendant also challenges admitting the detective's comment that he presumed defendant wanted to commit suicide because "there was some wrong doing there in his mind." This comment is certainly not probative of defendant's guilt. Because the detective bears the imprimatur of authority, moreover, his "belief" that defendant felt guilty is prejudicial.
 {¶ 77} We agree that these statements had no evidentiary/probative value concerning the question of defendant's guilt. Taken together, the statements amount to an emotional appeal to the jury and nothing more. Accordingly, the statements should not have been admitted. The next question is whether defendant was so prejudiced by the admission of the statements that the outcome of his trial would have been different without them.
 {¶ 78} Defendant argues that since the state failed to produce any evidence of "overt force," the victim-impact testimony served only to make the jury sympathetic towards the victim in this case. As we previously concluded, the state met its burden of proving defendant committed the crimes of rape and gross sexual imposition against the victim in this case. The state proved beyond a reasonable doubt that defendant used force against the victim. The state established that on numerous occasions the defendant physically forced himself on the victim. Defendant also used fear and duress as a type of force so that he could violate the victim not only physically, but psychologically and emotionally as well. Since the state met its burden of proof, defendant's argument that the subject testimony allowed the jury to convict him only out of sympathy for the victim is groundless.
 {¶ 79} Finally, defendant fails to identify how he was prejudiced by the subject testimony and how, if it had been excluded, the outcome of his trial would have been different.
 {¶ 80} On the record before this court, there is no evidence that had defendant's trial counsel objected or done more to keep out the cited testimony, the outcome of defendant's trial would have been any different. The tenth assignment of error is overruled.
Assignment of Error XI:
THE TRIAL COURT ERRED IN NOT GRANTING THE APPELLANT'S MOTION TO DISMISS FOR LACK OF A SPEEDY TRIAL.
 {¶ 81} Defendant argues that his right to a speedy trial was violated. We disagree.
 {¶ 82} "When reviewing a speedy trial question, the appellate court must count the number of delays chargeable to each side and then determine whether the number of days not tolled exceeded the time limits under R.C. 2945.71." State v. Borrero, Cuyahoga App. No. 82595, 2004-Ohio-4488, ¶ 10. Whether the trial court's ruling on the speedy trial question was correct is a mixed question of law and fact. Id. "The appellate court gives due deference to the trial court's findings of fact so long as those findings are supported by competent, credible evidence. Id. Nonetheless, the appellate court must review whether the court applied the law to the facts properly. Id. Furthermore, this court must construe the statutes strictly against the state when reviewing the legal issues in a speedy trial claim. Brecksvillev. Cook (1996), 75 Ohio St.3d 53, 1996 Ohio 171,661 N.E.2d 706." Id.
 {¶ 83} The statutes governing speedy trial are found in R.C. 2945. R.C. 2945.71 specifies the amount of time allocated for a speedy trial:
(C) A person against whom a charge of felony is pending:
* * *
(2) Shall be brought to trial within two hundred seventy days after the person's arrest.
* * *
(E) For purposes of computing time under divisions [**6] (A), (B), (C)(2), and (D) of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days. * * *
 {¶ 84} A defendant may be incarcerated, therefore, for a maximum of 90 days unless the time is tolled by one of the exceptions listed in R.C. 2945.72, which states in pertinent part:
The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:
* * *
(C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon his request as required by law;
(D) Any period of delay occasioned by the neglect or improper act of the accused;
(E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused * * *.
 {¶ 85} In the case at bar, defendant was arrested on March 28, 2004 and held without bond until his trial commenced on February 14, 2005. Under the speedy trial requirements, defendant should have been brought to trial by June 24, 2004. By these dates alone, it is clear that defendant was not brought to trial within the parameters of the speedy trial statutes. We must now determine whether any of the statute's tolling provisions apply.
 {¶ 86} The docket reflects the following entries:
04/28/2004 05/05/2004 D FIRST PRETRIAL IS SET FOR MAY 7, 2004
AT 10:00 A.M. CORRECTED ENTRY NOTES OF SAM.
05/07/2004 05/12/2004 D ATTORNEY DOMINIC VITANTONIO ENTERS ANAPPEARANCE. PRETRIAL HELD AND CONTINUED TO MAY 26, 2004 . . . SLP
* * *
05/26/2004 D MOTION FOR DISCOVERY BY THE DEFENSE, FILED . . . BJW
* * *
06/22/2004 06/22/2004 D1 MO STATE'S BILL OF PARTICULARS, FILED. 06/22/2004 06/22/2004 D1 MO STATE'S RESPONSE TO REQUEST FORDISCOVERY UNDER RULE 16, FILED.
* * *
07/30/2004 08/10/2004 N/A JE PRETRIAL HELD 07/30/2004.PRETRIAL CONTINUED TO 08/12/2004 AT 09:00 AM. AT THE REQUEST OFDEFENDANT 07/30/2004 CPBXM 08/02/2004 12:05:33
08/12/2004 08/13/2004 N/A JE HEARING CONTINUED TO 08-19-04 ATTHE DEFENDANT'S REQUEST. 08/12/2004 CPDXK 08/12/2004 10:37:39
08/19/2004 08/24/2004 N/A JE PRE-TRIAL HELD. FINAL PRE-TRIALAND PSYCHIATRIC HEARING SET FOR 09-10-04 AT 10:30 A.M. AT THEDEFENDANT'S REQUEST. 08/19/2004 CPDXK 08/19/2004 10:57:37
* * *
08/27/2004 08/27/2004 D1 MO MOTION FOR INDEPENDENT EXPERTEVALUATION OF DEFENDANT'S MENTAL CONDITION AT THE TIME OF THEOFFENSES CHARGED AT STATE'S EXPENSE, FILED. * * *
09/20/2004 09/22/2004 N/A JE DEFENSE MOVES THIS COURT FOR ANINDEPENDENT PSYCHOLOGICAL REPORT ON SANITY AT THE TIME OF THEACT. STATE OPPOSES. INDEPENDENT EVALUATION TO BE PERFORMED BYCANDICE RISEN, PHD OF BEACHWOOD, OH. TO BE PREPARED AT THE STATE'SEXPENSE AS DEFENDANT FOUND TO BE INDIGENT. TIME STAYED. HEARINGCONTINUED TO 10-29-04 AT 11:00 A.M. AT THE DEFENDANT'S REQUEST.
09/20/2004 CPDXK 09/20/2004 15:01:37
* * *
10/28/2004 11/02/2004 N/A JE HEARING OF 10-29-04 IS CONTINUEDTO 11-12-04 AT THE DEFENDANT'S REST. 10/28/2004 CPDXK
11/12/2004 11/16/2004 N/A JE PSYCHIATRIC HEARING SET FOR 12/08/2004 AT 11:00 AM. (RE-SCHEDULED) DR. McPHERSON PERMITTED TO VIEW PSYCHIATRIC CLINIC REPORTS. 11/12/2004 CPKLS 11/15/2004 09:50:08
12/13/2004 12/15/2004 N/A JE PARTIES STIPULATE TO THE FINDINGS OF BOTH THE COURT PSYCHIATRIC CLINIC AND DEFENDANT'S INDEPENDENT REPORT IN THAT DEFENDANT WAS SANE AT THE TIME OF THE ACT AND IS COMPETENT TO STAND TRIAL. TRIAL SET FOR 01/12/2005 AT 10:00 AM. 12/13/2004 CPSAM 12/13/2004 15:10:39
12/15/2004 12/17/2004 N/A JE TRIAL OF 01-12-05 IS SET AT THEDEFENDANT'S REQUEST DUE TO COUNSELS UNAVAILABILITY. 12/15/2004 CPDXK 12/15/2004 15:23:36
* * *
12/23/2004 12/23/2004 D1 MO MOTION TO WITHDRAW AS COUNSEL,FILED.
* * *
12/30/2004 12/30/2004 D1 MO MOTION TO DISMISS BOTH PSYCHIATRIC EVALUATIONS AND MOTION TO MANDATE AND REQUIRE POLYGRAPH TEST FOR ALL POTENTIAL JURORS, FILED. PRO SE 247942 CUYAHOGA COUNTY JAIL
* * *
01/06/2005 01/06/2005 D1 MO DEFENDANT'S WAIVER OF SPEEDYTRIAL, FILED.
01/06/2005 01/11/2005 N/A JE DEFENDANT INDIGENT; ATTORNEY DONALD BUTLER ASSIGNED ATTORNEY DOMINIC VITANTONIO GIVEN LEAVE TO WITHDRAW AS COUNSEL. TRIAL OF 1/12/2005 IS RESET FOR A PRETRIAL. TRIAL SET FOR 02/14/2005 AT 10:00 AM. DEFENDANT WAIVES SPEEDYTRIAL FROM 01/06/2005 TO 02/28/2005 IN WRITING AND IN OPENCOURT. AND SAME FILED BY THE CLERK OF COURTS. 01/06/2005 CPSKM 01/07/2005 10:28:29
* * *
02/14/2005 02/17/2005 N/A JE DEFENDANT IN COURT WITH ATTORNEY DONALD BUTLER. PROSECUTOR(S) BRENDEN SHEEHAN PRESENT. DEFENDANT FULLY ADVISED IN OPEN COURT OF HIS/HER CONSTITUTIONAL RIGHTS AND PENALTIES. JURY SELECTION BEGINS. 02/14/2005 CPDXM 02/15/2005 10:38:59. (Emphasis added).
 {¶ 87} Between March 28, 2004, the date of defendant's arrest, and August 19, 2004, defendant was responsible for tolling his speedy trial date by 88 days,[5] which brought his new trial date to September 21, 2004.
 {¶ 88} On August 27, 2004, defendant filed his motion for an independent psychiatric evaluation, the results of which were to be reported at a hearing set for October 29, 2004 at defendant's request. The request for an independent evaluation tolled defendant's speedy trial time by another 63 days, which when added to the September 21st trial date, extended the new speedy trial date to November 23rd.
 {¶ 89} The October 29, 2004 hearing was continued by defendant to November 12, 2004, adding another 14 days to bring the new trial date to December 7th. The November 12th
hearing had to be rescheduled because of defendant's earlier request for an independent psychiatric evaluation. The hearing was then continued until December 8, 2004, adding another 26 days to defendant's speedy trial time. The new trial date was now January 3, 2005.
 {¶ 90} On December 15, 2004, at defendant's request, trial was set for January 12, 2005. On January 6, 2005, defendant's counsel withdrew from the case and new counsel was assigned. Moreover, defendant gave a written and oral waiver of his speedy trial rights from January 6th to February 28, 2005. When trial began on February 14, 2005, any issues related to defendant's right to a speedy trial became moot.
 {¶ 91} From the chronology of the Court's docket, we conclude that defendant's own actions tolled his speedy trial date. Accordingly, defendant's right to a speedy trial was never violated. Defendant's eleventh assignment of error is denied.
Assignment of Error XII:
THE PROSECUTOR VIOLATED THE DEFENDANT'S DUE PROCESS RIGHTS AND COMMITTED PROSECUTORIAL MISCONDUCT BY, INTER ALIA, APPEALING TO THE PASSIONS AND PREJUDICES OF THE JURORS AND IMPLORING THE JURORS TO REACH A VERDICT ON BEHALF OF THE VICTIM.
 {¶ 92} Defendant argues that during closing argument, the prosecutor repeatedly asked the jury to "do justice" in this case. According to defendant, the prosecutor's statements inflamed the passions and prejudices of the jury because it implored them to be sympathetic towards the victim and therefore return a verdict of guilty against defendant.
 {¶ 93} "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the substantial rights of the accused. State v. Smith
(1984), 14 Ohio St.3d 13, 14-15, 14 OBR 317, 470 N.E.2d 883. The touchstone for analysis `is the fairness of the trial, not the culpability of the prosecutor.' Smith v. Phillips (1982),455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78." State v.McKnight, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 269,837 N.E.2d 315.
 {¶ 94} As previously stated by this court in State v.Lyons, Cuyahoga App. No. 80220, 2002-Ohio-3424, ¶ 11:
The role of an attorney in closing argument is to assist the jury in analyzing, evaluating and applying the evidence. Statev. Brand (1978), 56 Ohio App.2d 271, 272, 10 Ohio Op.3d 281,382 N.E.2d 1171. Ordinarily, the state is entitled to some latitude and freedom of expression during its closing argument. State v.Maurer (1984), 15 Ohio St.3d 239, 266, 15 Ohio B. 379,473 N.E.2d 768. The test for prosecutorial misconduct during closing argument is whether the comments were improper and, if so, whether they prejudicially affected the accused's substantial rights. State v. Smith (1984), 14 Ohio St.3d 13, 14,470 N.E.2d 883; State v. Landrum (1990), 53 Ohio St.3d 107, 111,559 N.E.2d 710. To determine prejudice, the record must be reviewed in its entirety. State v. Lott (1990), 51 Ohio St.3d 160, 166,555 N.E.2d 293.
 {¶ 95} In the case at bar, the state's closing argument involves seventeen pages of the transcript. Tr. 757-774. Of those 17 pages, only the last three involve the remarks defendant complains of. Those remarks are as follows:
MR. SHEEHAN: * * * And the person I worked for looked at me and said, "You know what? It's not about winning. It's not about losing. It's about doing justice. That what we're here for."
And folks, that's what we are here for, and that's part of the reason why I became a prosecutor, because it is about justice.
We go out and speak to these schools and talk about what we do for a living, and I always say, "I'm a prosecutor, and I do justice."
And this little girl raised her hand and said, "Mr. Sheehan, what's justice?"
I gave some answer that —
MR. BUTLER: Objection, Judge.
THE COURT: Overruled.
MR. SHEEHAN: I don't know what the answer was I gave, but I guess if I ask each and every one of you, the 13 of you, "What is justice," all of you would have a different answer in your mind, a different answer.
But, folks, let me propose to you that justice in a case is to correct an injustice.
And folks, an injustice occurred to [the victim], an injustice occurred to that young boy, a young boy who was hoping to just have a normal life, not be abused, a person who was taught to be respectful of adults, who lost his trust.
I think [the victim] said, "I lost my trust in him. I didn't think someone would disrespect me like that."
Folks, we ask you to do justice in this case, and we ask you to return a verdict of rape, because it would be an injustice to say that Nick wanted this to happen. It would be an injustice to say there was no force used.
And we ask you to return a verdict of gross sexual imposition for the touching that he did to Nick.
Tr. 272-274.
 {¶ 96} The prosecutor's closing remarks about justice were technically improper and unnecessary. Lyons, supra, ¶ 13. Comments directed at "doing justice" should not be a part of any party's summation. The bulk of the prosecutor's comments during closing argument, however, was directed at the evidence presented during the trial. As noted in Lyons, ¶ 13:
The few times the prosecutor retreated to making emotional pleas for justice, while senseless and unprofessional, cannot support a claim of prejudice to the extent that appellant was denied a fair trial.
We reach the same conclusion in the case at bar. Even though improper comments occurred in this case, we do not find that defendant was denied a fair trial or that any of his substantive rights were violated. Defendant's twelfth assignment of error is therefore overruled.
 {¶ 97} For the foregoing reasons, the judgment of the trial court is affirmed in part and reversed in part. Since we have sustained defendant's seventh and eighth assignments of error, we remand this case so that the trial court can vacate its classification of defendant as a sexual predator and determine whether defendant is a habitual sex offender pursuant to R.C.2950.09(E). Because we have sustained defendant's ninth assignment of error, this case is further remanded for resentencing.
Judgment accordingly.
It is ordered that appellant and appellee share the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
James J. Sweeney, P.J., concurs. Patricia A. Blackmon, J., concurs In Part and Dissents in Part with Separate Concurring and Dissenting Opinion.
[1] The trial court sentenced defendant to an eight-year prison term on each of his seven rape convictions and a three-year prison term on each of his three convictions for gross sexual imposition. All of defendant's prison terms were ordered to run concurrently with one another for a total prison term of eight years.
[2] The victim stated that defendant specifically bought him three knives and a pool stick.
[3] In Musgrave, the trial court's instruction was as follows:
Force means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing. Where the relationship between the victim and the Defendant is one of child and parent or other authority figure, the element for force need not be openly displayed or physically brutal.
It can be subtle and psychological. If you find beyond a reasonable doubt that under the circumstances in evidence, the victim's will was overcome by fear or duress or intimidation, the element of force has been proved. Threat includes a direct threat and a threat by innuendo. The victim need not prove physical resistance to the Defendant.
[4] Static 99 is a testing instrument used by social workers who assess a person's inclination to repeat prior behaviors.State v. Hayes, Cuyahoga App. No. 83515, 2004-Ohio-4491, ¶ 22.
[5] The first tolling period occurred on May 7, 2004, when the first pretrial was supposed to go forward. That pretrial, however, was continued to May 26, 2004 because defense counsel had just appeared in the case. Nineteen days, therefore, are added to defendant's speedy trial time and extend that date to July 16, 2004. The second tolling period occurred on May 26, 2004, when defendant requested discovery. The state responded to the discovery request on June 22, 2004. Between May 26th and June 22nd, defendant added 27 days to his speedy trial date which now became August 10, 2004. On July 30, 2004, at defendant's request, a scheduled pretrial was continued until August 12, 2004, extending the trial date by an additional 13 days to August 23, 2004. On August 12th, defendant requested another continuance to August 19, 2004, adding 7 days and making the new speedy trial date August 30th. On August 19, 2004, at defendant's request, the final pretrial and psychiatric hearing was set for September 10th, adding 22 more days to defendant's trial date, which now became September 21st.