JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Robert Watson, appeals his conviction for compelling prostitution and promoting prostitution. For the reasons that follow, we affirm in part, reverse in part, and remand.
 {¶ 2} In April 2006, the grand jury indicted Watson on two counts of compelling prostitution of "Jane Doe, d.o.b. August 15, 1989" (a minor), alleged to have occurred on February 26 and February 27, 2006, in violation of R.C. 2907.21; one count of compelling prostitution of "Jane Doe II, d.o.b. October 5, 1980," alleged to have occurred in February 2006, in violation of R.C. 2907.21; and two counts of promoting prostitution, in violation of R.C. 2907.22. He entered a plea of not guilty to the charges, and the case proceeded to a jury trial. The following evidence was presented at trial on July 25, 2007.
 {¶ 3} Dominique Williams testified that at the time of trial, she was 21 years old. She lived with Watson for approximately six months, beginning in August 2005. Pamela Roupe and Amanda Sheppard also lived there (she did not know Amanda's last name, but later testimony establishes it). During that time, she testified that she was in a relationship with Watson, but stated Roupe was just a friend. She, Roupe, and Sheppard were prostitutes, "[d]oing sexual *Page 4 
activities for money." Williams said that she called Watson "Bobby," but the other women called him "daddy."
 {¶ 4} According to Williams, she would stand in front of the apartment and "wave down the cars." The cars would stop "and we would get together." After the client paid her for sex, Williams said she would give the money to Watson. When she needed something, like clothes or food, she would tell Watson, and he would get her what she needed. She explained that sometimes she would keep the money for herself, but most of the time, she would give it to Watson. She did not work every day, only "sometimes."
 {¶ 5} Williams recalled that on February 27, 2006, she was arrested for prostitution. She said that she and Sheppard were walking down the street "when a dude drove down 87th so we got in the car and it was an undercover." She said she never gave a statement to the police because she was trying to protect Watson. After she was arrested, Williams was released on bond. She went back to the apartment with Watson and continued working as a prostitute for about one month. She then went to live with her mother.
 {¶ 6} She stated that when she lived with Watson, he treated her "[v]ery good." She further testified that the other women also gave him their earnings. *Page 5 
 {¶ 7} On cross-examination, Williams agreed that she had been prosecuted for prostitution later in 2006, when she was no longer living with Watson, and that she "prostituted for a guy named Anthony Willis."
 {¶ 8} Detective Erwin Eberhardt testified that on February 27, 2006, he was working as a plain-clothed, undercover detective. He explained that he "was being a john; in other words, [he] would look for females that were stopping cars waving them down." He stated that he was traveling down Madison Avenue when he noticed "two females standing in the doorway * * * waving at cars." He turned his vehicle around, and when he got back to where they had been, he saw them walking down the street. He pulled over and asked them if they needed a ride. They got into the car and "basically the transaction was going to be $40 for head." He drove them to the "prearranged meeting place where the takedown car stopped [them]," and the other officers arrested the two women. He said the women's names were Donnise Adkins and Amanda Sheppard.[1]
 {¶ 9} Detective Michael Duller testified that as a vice detective, he primarily investigated crimes relating to "narcotics * * *, prostitution, gambling, and liquor incidents." On February 27, 2006, he stated that he was in plain *Page 6 
clothes, but his job was to assist "in the takedown or arrest." Detective Eberhardt radioed him and other officers that he had seen two females lingering in front of the building on Madison. Detective Duller then assisted with the arrest of the women.[2]
 {¶ 10} Detective Duller testified that he obtained a written statement from Roupe and another officer obtained a written statement from Sheppard. He explained that they found Roupe in the apartment, and she was "taken into custody for purposes of the continuation of the investigation." Watson was not at the apartment, but he was named as a suspect that same day.
 {¶ 11} Detective Duller agreed on cross-examination that Roupe did not appear frightened, nor did he see her exchange money or see her "doing any kind of prostitution." He stated that based on statements "that were taken" by Sheppard and Roupe, the officers discovered that Watson was allegedly forcing them to prostitute.
 {¶ 12} Roupe testified that her date of birth was October 5, 1980. She lived with Watson for a year and a half throughout 2005 and 2006. She stated that Williams and Sheppard also lived there for a period of time. She prostituted the *Page 7 
entire time she lived with Watson, every day for about four or five hours a day. She stated that she would give her earnings to Watson. She further testified that she did not have another job, and Watson "supported [them]," meaning her, Williams, and Sheppard.
 {¶ 13} According to Roupe, when the officers came to the apartment in February 2006, she gave them permission to search it. She also gave the officers a written statement at the police station. After she gave her statement (which is not in the record on appeal), she said that she continued to prostitute for approximately two more months. Roupe was not arrested at that time, but she did go to the police station, where she gave a statement.
 {¶ 14} Roupe further testified that she met Watson in 2003. About a year after she met him, "he just asked her" if she would prostitute for him. She stated that she did not recall ever keeping the money for herself. When asked why she gave her earnings to Watson, she said, "[e]very time we came in he would ask us for the money and we gave it to him. The main things we needed he would go out and get it for us." When further asked why she did not keep the money, she replied, "[h]e would never allow us to keep any money."
 {¶ 15} On cross-examination, Roupe agreed that Sheppard and Williams never received mail at the apartment on Madison Avenue. She stated that Williams worked "on her own as a prostitute." *Page 8 
 {¶ 16} On redirect examination, Roupe clarified that during the six months Williams lived with them, Williams only prostituted for Watson.
 {¶ 17} Upon further questioning by jurors, Roupe stated that "nothing would happen" if she did not give the money to Watson. She also testified that there were no repercussions from Watson "if the money was not given to him." Nor was she afraid of Watson. Contrary to her testimony on direct examination, Roupe told the jury that sometimes she "would hold back some money that [Watson] didn't know about."
 {¶ 18} Upon further redirect examination, Roupe explained that she would only give Watson "maybe half of what I made." She also stated that other "girls" held back money from Watson. When asked, "did you have any other way to get clothes or food or anything," she replied, "[t]he money that I held back for myself, yes."
 {¶ 19} Watson moved for a Crim. R. 29 acquittal at the close of the state's case. The trial court granted it with respect to counts one and two, compelling prostitution of a minor, but denied it as to the other counts.
 {¶ 20} The jury found Watson guilty of the remaining counts, namely, two counts of promoting prostitution and one count of compelling prostitution. The trial court sentenced Watson to 18 months for the two promoting prostitution convictions and five years for the compelling prostitution conviction and ordered *Page 9 
that they be served concurrently to one another, but consecutive to Watson's federal case. The court also notified Watson that he would be subject to five years of postrelease control upon his release from prison.
 {¶ 21} It is from this judgment that Watson appeals, raising two assignments of error for our review:
 {¶ 22} "[ 1.] The evidence is insufficient to sustain a conviction of compelling prostitution pursuant to R.C. 2907.22.
 {¶ 23} "[2.] The trial court erred by unduly limiting the appellant's cross-examination of Dominique Williams."
 Sufficiency of the Evidence {¶ 24} Watson argues that "Pam Roupe's testimony establishes that she was not forced to engage in prostitution." He maintains that "[h]er actions, by her own words, establish the voluntary nature of her activity."
 {¶ 25} An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v. Thompkins (1997), 78 Ohio St.3d 380, 386. The *Page 10 
relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jenks at 273.
 {¶ 26} In order to convict Watson of compelling prostitution under R.C. 2907.21(A)(1), the state was required to establish beyond a reasonable doubt that Watson knowingly compelled Roupe to engage in sexual activity for hire.
 {¶ 27} "Knowingly" is set forth in R.C. 2901.22(B), which provides "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 28} Watson is correct that the Ohio Revised Code does not define "compel" and also that there is a "surprising dearth of case law on this issue."[3] He urges this court to adopt the definition of "compel" set forth in the 1985 American Heritage Dictionary, which according to Watson defines "compel" as "to force drive or constrain" or "to necessitate or pressure by force."
 {¶ 29} The state maintains that we should adopt "the definition of compel from the Ohio Jury Instructions," which is "cause by the use of force or threat of *Page 11 
force, duress, or coercion of any kind." See 4 OJI 507.21. The state argues that Watson "held out life's bare necessities to coerce Pamela Roupe into engaging in sexual activity for hire," and as such, "this arrangement falls under the meaning of `coercion of any kind."
 {¶ 30} We agree with the state that "compel" should not be defined as Watson argues, but not because of the Ohio Jury Instructions. The 1974 Committee Comments to R.C. 2907.21 state, "the compulsion used may be force or threat of force, duress, or coercion of any kind."
 {¶ 31} Of the terms, "force or threat of force," "duress," or "coercion of any kind," force is the only one explicitly defined by the Ohio Revised Code. Thus, we will turn to other case law for interpretation of them. Even though "force" is defined, we will begin with it to distinguish it from the others and, also, to understand the legislature's intent in using the word "compel."
 {¶ 32} Force is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).
 {¶ 33} In State v. Milam, 8th Dist. No. 86268, 2006-Ohio-4742, this court explained the elements of "force or threat of force" in the context of establishing rape.
 {¶ 34} "The crime of rape is defined in R.C. 2907.02(A)(2) as follows: *Page 12 
 {¶ 35} "`No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.'
 {¶ 36} "With regard to the rape of an adult person, the element of `force' is defined as `any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing.' R.C. 2901.01(A). `A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit.' State v. Schaim, 65 Ohio St.3d 51,1992-Ohio-31, paragraph one of the syllabus." Milam at _6.
 {¶ 37} When the victim is of tender age or there is a parental-like relationship involved, however, the definition of "force or threat of force" in a rape case is "more relaxed" and may not require actual physical force or threat of actual physical force. Id. at _7-15, citingState v. Dye (1998), 82 Ohio St.3d 323 and State v. Eskridge (1988),38 Ohio St.3d 56.
 {¶ 38} As we stated, duress and coercion are not defined for purposes of compelling prostitution under R.C. 2907.21, nor could we find any case law directly on point, i.e., addressing their meaning within the context of compelling prostitution. We did find case law interpreting their meanings, however, with respect to other offenses, including sex offenses in R.C. Chapter 2907. *Page 13 
 {¶ 39} Several cases discuss the definition of coercion relating to the offense of sexual battery. Sexual battery, set forth in R.C. 2907.03(A)(1), provides in relevant part that: "No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * the offender knowingly coerces the other person to submit by any means that would prevent resistance by a person of ordinary resolution."
 {¶ 40} In In re J.A.S., 12th Dist. No. CA2007-04-046, 2007-Ohio-6746, the court explained:
 {¶ 41} "The Revised Code does not define `coercion'; however, the commentary to R.C. 2907.03 states that sexual conduct by coercion `is somewhat broader than sexual conduct by force.' Coercion for purposes of sexual battery does not by necessity include force or threat of force, although it may. See State v. Wilkins (1980), 64 Ohio St.2d 382 (finding that because force or threat of force always constitute coercion, sexual battery under R.C. 2907.03[A][1] is a lesser included offense of rape under R.C. 2907.02[A][2]); State v. Tolliver (1976), 49 Ohio App.2d 258. However, the state need not prove force or the threat of force to prove sexual battery. State v. Johnson, 112 Ohio St.3d 210, 2006-Ohio-6404, _268.
 {¶ 42} "Coercion for purposes of sexual battery has been defined as `to compel by pressure.' See In re Jordan (Sept. 12, 2001), 9th Dist. *Page 14 
No. 01CA007804. Webster's Third New International Dictionary (1993) defines `to coerce' in relevant part as `to restrain, control, or dominate, nullifying the individual will or desire,' `to compel to an act by force, threat, or other pressure,' and `to bring about * * * by force, threat, or other pressure.' Id. at 439. Black's Law Dictionary (5th Ed. 1979), in turn, states that coercion `may be actual, direct, or positive, as where physical force is used to compel act against one's will, or implied, legal, or constructive, as where one party is constrained by subjugation to other to do what his free will would refuse.' Id. at 234." J.A.S. at 18-19.
 {¶ 43} In State v. Woods (1976), 48 Ohio St.2d 127, 135-136, overruled in part, on other grounds by State v. Downs (1977), 51 Ohio St.2d 47, the Ohio Supreme Court described the terms "coercion" and "duress" as follows:
 {¶ 44} "The words "coercion" and "duress" are not synonymous, although their meanings often shade into one another. "Duress" generally carries the idea of compulsion, either by means of actual physical force or threatened physical force applied to the person (or to some near relative of the person) to be influenced, or applied to the property or reputation of such person. "Coercion" may include a compulsion brought about by moral force or in some other manner with or without physical force.' * * * Coercion has been found in a wife's refusal to return to her husband and resume marital relations * * *, and in an employer's *Page 15 
warning to striking workers that if they did not return to work by a certain day their jobs would be filled.
 {¶ 45} "These judicial definitions of coercion correspond to the common use of the word. Webster's Third New International Dictionary defines coercion as `the act of coercing: use of physical or moral force to compel to act or assent,' and to coerce as `to restrain, control or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation).'
 {¶ 46} "The essential characteristic of coercion which emerges from these definitions is that force, threat of force, strong persuasion or domination by another, necessitous circumstances, or some combination of those, has overcome the mind or volition of the defendant so that he acted other than he ordinarily would have acted in the absence of those influences." (Internal citations omitted.) Woods at 136-137.
 {¶ 47} To distinguish the facts here from cases where the state proved "compelling prostitution," Watson cites two cases, State v. Francis (May 4, 1994), 9th Dist. No. 16351, and State v. Mitchell, 8th Dist. No. 88977, 2007-Ohio-6190. In Francis, the appellant was the victim's father who did not return her to her foster parents' home after a visitation. The victim was 17 years old. When she was found three weeks later, she had lost 25 pounds and had abrasions and bruises all over her body. She testified that her father provided her with crack *Page 16 
cocaine and alcohol, even though he knew she was a recovering addict. While she was disoriented from the drugs, he raped her. After a few days of giving her cocaine, he threatened to withhold it from her if she refused to engage in prostitution. On one occasion, the appellant had a party and "collected money at the bedroom door while numerous men forced her to have sexual intercourse." Id.
 {¶ 48} In Mitchell, the facts established that the appellant had yelled at the victim when he learned that she did not make any money. He told her that she could not come back to his apartment without money. When she finally came back to his apartment, she gave him $20, and he told her "good job." Testimony also established that the appellant yelled at the victim about clothing that he had bought her, and he told her that she needed to prostitute herself so that she could earn the money she owed him. One of the appellant's friends "physically harmed and/or threatened" the victim so she would comply with his demands. In addition, the appellant had told the victim that she was going to be his new "ho," and that she was going to make money for him. The victim further testified that she was scared and that the appellant forced her to engage in sexual activity for money on numerous occasions.
 {¶ 49} After reviewing the record in this case, we agree with Watson that the state failed to present sufficient evidence such that any rational trier of fact *Page 17 
could have found beyond a reasonable doubt that he compelled Roupe to engage in sexual activity for hire.
 {¶ 50} The state maintains that the evidence established that "[a]ppellant essentially arranged it so the girls had no other way of obtaining food, clothing, or shelter without prostituting themselves and turning over their earnings to him." The state further argues that "[a]ppellant held out life's bare necessities to coerce Pamela Roupe into engaging in sexual activity for hire." As such, the state contends that this "arrangement falls under the meaning of `coercion of any kind."
 {¶ 51} We disagree with the state's assessment of what the facts established. Roupe did testify that she would give her earnings to Watson and that "he would never allow us to keep any money." She also stated on direct examination that she could not recall ever keeping her earnings. But she later admitted upon questioning from the jury that she would sometimes hold back money that Watson did not know about. She further explained on redirect examination that she would only give Watson "maybe half of what I made" and that the other "girls" held back money from Watson too. She also stated that she had money to buy clothes and food because of the money she held back from Watson. *Page 18 
 {¶ 52} Most significant to our analysis, however, is the fact that Roupe testified that "nothing would happen" if she did not give the money to Watson. She did not testify that if she did not give him the money that he would kick her out of the apartment or hold back "life's bare necessities" from her. She said that "nothing would happen."
 {¶ 53} Also notable is the fact that Roupe testified that after living with Watson for about a year, "he just asked her" if she would prostitute for him, and she agreed. She did not state that he forced her in any way to engage in sexual activity for hire or that he threatened to hold back food or clothing from her, or even that he would make her leave the apartment if she did not do it. He just asked her, and she agreed.
 {¶ 54} We recognize that "the state may use either direct or circumstantial evidence to prove the essential elements of an offense."Jenks, supra, at 272. "`Circumstantial evidence * * * is proof of facts or circumstances by direct evidence from which [the fact finder] may reasonably infer other related facts which naturally and logically follow according to the common experience of mankind.'" State v.Rohr-George, 9th Dist. No. 23019, 2007-Ohio-1264, _21, quoting State v.Blankenship (Sept. 21, 1994), 9th Dist. No. 2815. Further, circumstantial evidence "permits legitimate inferences." Waterville v.Lombardo, *Page 19 
6th Dist. No. L-02-1160, 2004-Ohio-475, _18. One court described circumstantial evidence to the jury as:
 {¶ 55} "[C]ircumstantial evidence as using your common sense and logic. Evidence may also be used to prove a fact by inference. This is referred to as circumstantial evidence. Circumstantial evidence is the proof of facts by direct evidence from which you may infer other reasonable facts or conclusions. If I were to say to you, it is January the 4th 1990, and we are in Newark, Ohio, and it is noon, couldn't you logically infer that it is daylight in Newark, Ohio? This [is] what you call using your common sense. Now, you may not make one inference from another inference, but you may draw more than one inference from the same facts or circumstances." State v. Mayle (Aug. 27, 1990), 5th Dist. No. CA-3520.
 {¶ 56} Based on the facts presented here, however, we cannot find, directly or circumstantially, that the state presented sufficient evidence to establish the necessary element of compel. That is, we find that the state failed to present sufficient evidence of force, threat of force, duress, or "coercion of any kind." While "coercion of any kind" is a closer call, we are constrained by the facts. There must be some evidence presented that amounts to coercion of any kind, which we do not find in the record here. *Page 20 
 {¶ 57} Accordingly, we find that the state failed to present sufficient evidence to prove beyond a reasonable doubt that Watson compelled Roupe to engage in sexual activity for hire.
 {¶ 58} Watson's first assignment of error is sustained; his compelling prostitution conviction is reversed and vacated.
 Limited Recross-Examination {¶ 59} In his second assignment of error, Watson argues that the trial court unduly limited his cross-examination of Dominique Williams, which violated his right to confrontation. He claims that the trial court prevented him from challenging Williams' credibility. We disagree.
 {¶ 60} We review the trial court's limitation of cross-examination under an abuse of discretion standard. State v. Gresham, 8th Dist. No. 81250, 2003-Ohio-744.
 {¶ 61} At trial, Williams testified first. Watson then cross-examined her. During cross-examination, Williams admitted that she had been prosecuted for prostitution after she was no longer living with Watson, and she further admitted that she "prostituted for a guy named Anthony Willis." The state then questioned her on redirect examination about her February 2006 arrest. Upon further recross-examination, Watson attempted to ask Williams if she had ever *Page 21 
been convicted of prostitution. The state objected, and the trial court sustained the state's objection, stating, "[i]t's not within the scope of those last questions."
 {¶ 62} The scope of cross-examination is governed by Evid. R. 611(A), which provides: "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." The Ohio Supreme Court has observed: "Although a defendant must have the opportunity to cross-examine all witnesses against him as a matter of right, * * * the opportunity to recross-examine a witness is within the discretion of the trial court." State v. Faulkner (1978),56 Ohio St.2d 42, 46. Courts have further held it is "only when a prosecutor, on redirect examination, delves into new areas that a trial court must allow recross-examination by a defendant." State v. Carter (Feb. 22, 1995), 3d Dist. No. 3-94-21.
 {¶ 63} In State v. Moore, 8th Dist. No. 90058, 2008-Ohio-2352, this court stated:
 {¶ 64} "`Generally, the recross-examination of a witness cannot exceed the scope of redirect examination.' State v. Savage (Feb. 9, 1989), 8th Dist. No. 55046. (Internal citations omitted.) Furthermore, it is within `the sound *Page 22 
discretion of the trial court to control the examination of witnesses.' Id. See, also, Evid. R. 611(A).
 {¶ 65} "In State v. Hartley, 8th Dist. No. 81706, 2003-Ohio-3946, we held that `the court should seek to limit recross-examination to testimony on redirect examination which raises a new subject-matter that is both material and non-redundant in context.' `The redundancy aspect should be applied to limit recross-examination to matters that were not, or could not, have been raised on cross-examination.' Id."Moore at _6-7.
 {¶ 66} Here, Watson had already asked Williams on cross-examination if she had ever been prosecuted for prostitution. She admitted she had. After redirect examination, where the state had her reaffirm that in February 2006 she had only prostituted for Watson, it was beyond the scope of redirect examination to ask her on recross-examination whether she had been convicted of prostitution. Accordingly, we find that the trial court did not abuse its discretion when it limited Watson's recross-examination.
 {¶ 67} Watson's second assignment of error is overruled.
 {¶ 68} Judgment affirmed in part (with respect to promoting prostitution), reversed in part (with respect to compelling prostitution), and remanded to vacate the conviction and sentence for compelling prostitution.
It is ordered that appellee and appellant share costs herein taxed. *Page 23 
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed in part, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY EILEEN KILBANE, J., CONCURS; COLLEEN CONWAY COONEY, A.J., CONCURS IN JUDGMENT ONLY
[1] Although not entirely clear, it appears from the testimony of the other witnesses that it was Williams who was with Sheppard, not Donnise Adkins. Later testimony established that Adkins also prostituted for Watson and may have been arrested the same day, but not with Sheppard and Williams.
[2] Again, the testimony is not clear. Detective Duller stated that he took part in arresting Adkins, whom he said was picked up by Detective Eberhardt. He then stated that 25 minutes later, Detective John Schroeder had picked up Williams and Sheppard. It is clear though that the three women were all connected to Watson and were all arrested apparently within 30 minutes of each other in a "sting" operation.
[3] In fact, our independent research revealed less than ten cases discussing the elements of compelling prostitution, and not one was on point with the case sub judice. *Page 1