[Cite as *State v. Brooks*, 2011-Ohio-6643.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 96552**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ARTHUR BROOKS

DEFENDANT-APPELLANT

**JUDGMENT:**
**AFFIRMED**

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-542564

**BEFORE:** Kilbane, A.J., Blackmon, J., and Keough, J.

**RELEASED AND JOURNALIZED:** December 22, 2011

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
Leader Building
Suite 940
526 Superior Avenue
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
John R. Kosko
T. Allan Regas
Assistant County Prosecutors
The Justice Center - 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, A.J.:

{¶ 1}  Defendant-appellant, Arthur Brooks, appeals from his convictions for three counts of sexual battery and two counts of sexual imposition.   For the reasons set forth below, we affirm.

{¶ 2}  On October 14, 2010, defendant was indicted pursuant to a seven-count indictment in connection with the January 22, 2010 attack upon A.D.,[1] a high school freshman.

---

[1]The victim and State's witnesses are referred to herein by their initials in accordance with this court's policy regarding nondisclosure of identities in cases involving sexual violence.

{¶ 3} Counts 1 through 4 charged defendant with rape in violation of R.C. 2907.02(A)(2), with a sexually violent predator specification. Counts 5 and 6 charged him with gross sexual imposition in violation of R.C. 2907.05(A)(1), with a sexually violent predator specification. Count 7 charged him with kidnapping in violation of R.C. 2905.01(A)(4), with a sexual motivation specification. Defendant pled not guilty. He waived his right to a jury trial as to the specifications, and trial on the principal charges proceeded to a jury trial on January 26, 2011.

{¶ 4} For its case, the State presented the testimony of A.D.; Cleveland Police Officers David Fox (Officer Fox) and Karl Lessman (Officer Lessman); L.D., mother of A.D.; East High School counselor Debra Chapman; D.M., the best friend of A.D.; and Tracy Williams, a social worker with the Cuyahoga County Department of Children and Family Services (CCDCFS).

{¶ 5} A.D. testified that in 2010, she was living in a two-family house in the area of East 79th Street and Superior Avenue. Her grandmother lived in the downstairs unit, and she and her mother lived in the upstairs unit. A.D. slept in a bedroom on the second floor. Her mother slept in a bedroom in the attic. In the winter, however, A.D.'s mother slept in a trundle bed attached beneath A.D.'s bed because her bedroom in the attic did not have heat.

{¶ 6} In the summer of 2009, L.D. was dating defendant, who lived in a house behind her house. A.D. was assigned to summer school that year, and defendant generally drove her there and picked her up.

{¶ 7}  At around 5:00 p.m., on January 22, 2010, defendant and his brother came to L.D.'s house to watch a basketball game.   At around 10:00 p.m., A.D. went to sleep on the lower trundle bed.   In the middle of the night, someone picked her up and placed her on the higher bed.   When she awoke a little later, her pajama pants were untied and were pulled down to her knees.   A.D. pulled her pajama bottoms back up and went to sleep.

{¶ 8}  She awoke again later, at around 1:40 or 2:00 a.m.   At this time, her pajama pants were down again and a man had his hands on her thighs.   Although it was dark in the room, she could tell that it was defendant from the shape of his head, and that he was in the lower bed.   A.D. was shocked and scooted away but defendant continued to feel A.D.'s thighs, off and on, for the next several hours.     He then grabbed her left breast.   A.D. further testified that her mother was in the lower bed with defendant and giving him oral sex during this incident.

{¶ 9}  Defendant subsequently asked L.D. to get him some water.   While L.D. left the room, defendant leaned over and began sucking on A.D.'s breast.   When the mother returned, she continued to give him oral sex.   Defendant then asked her for something else and she again left the room.   At that time, defendant got into the higher bed with A.D.   He squatted over her and spread her legs apart, then penetrated her vagina orally and then digitally.   She put her legs together and pretended to be asleep because she was afraid.   Defendant later returned to the lower bed; however, he continued to touch A.D.   She stated that defendant penetrated her more than twice, and

she acknowledged that she had indicated in her previous interviews that he had done so three times or possibly four times before.

{¶ 10} At around 5:00 a.m., after defendant and L. D. had fallen asleep, A.D. went to the bathroom and telephoned her best friend, D.M., and her then boyfriend, A.C., to tell them what had happened. She then washed, and A.C. picked her up and drove her to his house. A.D. told her boyfriend's mother what had happened. The boyfriend's mother asked A.D. to call the police, but A.D. was afraid that she would be taken away from her mother and afraid that defendant would retaliate, so she did not want to do so. The boyfriend's mother then instructed her to tell L.D. L.D. was quiet when A.D. told her what occurred.

{¶ 11} When A.D. returned to school, she asked her English teacher whether a victim should report being "violated" to the police. She then indicated that she had been violated. A.D. next spoke to her counselor, Debra Chapman (Chapman); the school principal; and a social worker with the CCDCFS about the incident. Later, L.D. was summoned to the school regarding the matter. A.D. spent the night at her boyfriend's home.

{¶ 12} A.D. acknowledged on cross-examination that she did not give the "exact same account" of the incident to everyone she had talked to about the matter. She also acknowledged that defendant did not pin her down during the incident. The school had also sent a notice to her home regarding truancy concerns immediately before she reported the incident.

{¶ 13} Chapman testified that A.D. spoke with the principal about the matter, and further testified that A.D.'s demeanor was sad and withdrawn. Chapman contacted the CCDCFS through the 696-KIDS hotline and called the police and L.D.

{¶ 14} Following a placement hearing the next day, A.D. was taken from her mother and placed with a family member.

{¶ 15} L.D. testified that defendant had been her boyfriend for about six or seven months prior to the incident. Although defendant had previously lived nearby, he was now staying at his father's house. L.D. and defendant saw each other about twice a week and if defendant slept over, he slept on one of the sofas in the livingroom. With regard to the events of January 22, 2010, L.D. stated that defendant and his brother came over to watch a basketball game and were "semi-drunk and high." A.D. went to bed and defendant's brother fell asleep on one of sofas. Defendant stated that he had a bad back and could not sleep on the other sofa, so L.D. agreed to let him sleep on one of the beds in A.D.'s bedroom.

{¶ 16} L.D. denied seeing defendant touch A.D., and further testified that:

{¶ 17} "[W]e're on the floor. She's up here. It would have been kind of hard to do that." L.D. acknowledged leaving to get defendant water, however.

{¶ 18} The following morning, L.D. offered A.D. some ice cream, and A.D. then went to school. Defendant and his brother then left at around 7:30 a.m. Later, A.D. telephoned L.D. from her boyfriend's house and reported that defendant had touched her.

L.D. was in shock.   When she next saw defendant she asked him about it and he denied touching A.D., but later said that he was drunk and it could have happened.

{¶ 19} L.D. discussed the matter with her daughter and offered to call the police, but A.D. did not want to do so.   Things then went on "as normal" and L.D., on one occasion, even left A.D. alone with defendant and his son.   About a month later, L.D. was summoned to her daughter's school over the incident to speak with a social worker and police.   At this time, she stated that her daughter was known for lying.   She also told the police that defendant was at his father's house, but she did not know where his father lived.   L.D. later lost custody of A.D. for failing to complete required parenting classes.

{¶ 20} According to L.D., A.D.'s demeanor toward defendant did not change following the incident.   In a subsequent discussion, however, defendant reportedly told L.D. that the incident could have happened because he was drunk.

{¶ 21} On cross-examination, L.D. read a portion of her responses to police during the investigation in which she related that A.D. believed that defendant had touched her because when she awoke, her pajamas were untied.   She also stated that she would not have permitted molestation to occur in her presence.

{¶ 22} A.D.'s best friend, D. M., testified that after A.D. moved from her mother's house, defendant's truck would occasionally be parked there.

{¶ 23} Officer Lessman testified that he conducted a followup investigation in this matter.   He stated that L.D. at first did not seem cooperative, but ultimately gave a

statement to police on May 10, 2010. He also communicated with A.D.'s guardian ad litem assigned in the custody matter pending in juvenile court who opined that A.D. should not be returned to L.D.'s house.

{¶ 24} Officer Fox testified that he was assigned to East High School and that at the end of the school day on February 18, 2010, a school security guard informed him that a CCDCFS social worker needed to speak with him regarding an alleged assault. He and his partner, Phillip Kirkendall, spoke with a county social worker and school counselor Debra Chapman. The officers interviewed A.D. in the presence of the social worker and counselor, and learned defendant's name and address. A.D. was taken to CCDCFS, and the officers spoke with L.D., A.D.'s mother, then transported her to CCDCFS for a family custody meeting.

{¶ 25} At the close of the State's case, the trial court entered a judgment of acquittal as to the kidnapping charge in Count 7. The matter was then submitted to the jury.

{¶ 26} Defendant was subsequently convicted of three counts of sexual battery, in violation of R.C. 2907.03(A)(1), as lesser included offenses of Counts 1, 2, and 3; acquitted of rape as to Count 4; and convicted of misdemeanor charges of sexual imposition, in violation of R.C. 2907.06, as lesser included offenses of Counts 5 and 6. The trial court acquitted defendant of all of the specifications.

{¶ 27} On March 3, 2011, the trial court sentenced defendant to a total of two years of imprisonment, plus five years of mandatory postrelease control. Defendant was also

designated a tier III sexual offender.   Defendant now appeals and assigns two errors for our review.

ASSIGNMENT OF ERROR ONE

**"The trial court erred in denying Appellant's motion for acquittal as to the charges when the state failed to present sufficient evidence to sustain a conviction."**

{¶ 28} Within this assignment of error, defendant asserts that the trial court erred in denying the motion for a judgment of acquittal of the charges.

{¶ 29} Crim.R. 29(A), which governs motions for acquittal, states:

**"The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."**

{¶ 30} The sufficiency of the evidence standard of review is set forth in *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus as follows:

**"Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."**

{¶ 31} *Bridgeman* must be interpreted in light of the sufficiency test outlined in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, in which the Ohio Supreme Court held:

**"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.   The relevant inquiry is whether, after viewing the**

evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)"

{¶ 32} In the instant case, defendant was convicted of three counts of sexual battery, in violation of R.C. 2907.03(A)(1), and misdemeanor charges of sexual imposition, in violation of R.C. 2907.06.

{¶ 33} The essential elements of sexual battery are, in relevant part, as follows:

"(A)  No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:

" (1)  The offender knowingly coerces the other person to submit by any means that would prevent resistance by a person of ordinary resolution."

{¶ 34} In *In re J.A.S.*,Warren App. No. CA2007-04-046, 2007-Ohio-6746, the court affirmed a conviction for sexual battery under R.C. 2907.03(A)(1) and explained the element of coercion as follows:

"Coercion for purposes of sexual battery has been defined as 'to compel by pressure.'  See *In re Jordan* (Sept. 12, 2001), Lorain App. No. 01 CA007804. Webster's Third New International Dictionary (1993) defines 'to coerce' in relevant part as 'to restrain, control, or dominate, nullifying the individual will or desire,' 'to compel to an act by force, threat, or other pressure,' and 'to bring about * * * by force, threat, or other pressure.'  Id. at 439.  Black's Law Dictionary (5th Ed.1979), in turn, states that coercion 'may be actual, direct, or positive, as where physical force is used to compel act against one's will, or implied, legal, or constructive, as an where one party is constrained by subjugation to [an]other to do what his free will would refuse.'  Id. at 234."  Accord *State v. Watson*, Cuyahoga App. No. 90962, 2009-Ohio-2120.

{¶ 35} The *J.A.S.* court then affirmed the conviction for sexual battery, in violation of R.C. 2907.03(A)(1), where the evidence demonstrated that the defendant engaged in sexual conduct with the victim with others nearby, the victim tried to avoid the defendant, but did not tell him "no" or to stop. The court found that the defendant coerced or compelled the victim to submit to sexual conduct against her will.

{¶ 36} The essential elements of sexual imposition are, in relevant part, as follows:

**"(A)   No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:**

**"(1)   The offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard.**

**"(2)   The offender knows that the other person's, or one of the other person's, ability to appraise the nature of or control the offender's or touching person's conduct is substantially impaired.**

**" (3)   The offender knows that the other person, or one of the other persons, submits because of being unaware of the sexual contact. * * ***

**"(B)   No person shall be convicted of a violation of this section solely upon the victim's testimony unsupported by other evidence."**

{¶ 37} In this matter, the victim testified that after she fell asleep, and while the girl's mother was in the room and having oral sex with defendant on the lower trundle bed, defendant stroked A.D.'s thighs and grabbed her breasts. Defendant then had L.D. leave the room on two separate occasions. When L.D. left the room the first time, the defendant sucked on A.D.'s breast, and during the second occasion, he squatted over the girl then orally and digitally penetrated her. The evidence concerning the incidents of

penetration is sufficient to support defendant's convictions for sexual battery under R.C. 2907.03(A)(1).    In addition, L.D. testified that the sleeping arrangement was as A.D. described, and that defendant had L.D. leave the room.   Defendant also told L.D. that the incident may have happened and that he was drunk.   The record therefore demonstrates that defendant coerced A.D. to submit by any means that would prevent resistance by a person of ordinary resolution, by touching her after she had been asleep, and compelling her by circumstances so fundamentally inappropriate that she was required to maintain the fiction that she remained asleep while her mother and defendant engaged in oral sex in the lower bed.   In our view, defendant used constraint to subjugate her and engage in sexual conduct with her against her will.

{¶ 38} Further, the evidence concerning the incidents when defendant rubbed her thighs while she was asleep and surreptitiously grabbed and sucked her breasts is sufficient to support the convictions for sexual imposition.

{¶ 39} The first assignment of error is without merit.

ASSIGNMENT OF ERROR TWO

**"Appellant's convictions are against the manifest weight of the evidence."**

{¶ 40} In the second assigned error, defendant argues his convictions are against the manifest weight of the evidence.

{¶ 41} In determining whether a conviction is against the manifest weight of the evidence,   the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.  *State v. Thompkins*, 78 Ohio St.3d

380, 387, 1997-Ohio-52, 678 N.E.2d 54,  citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.  The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. "  Id., quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

{¶ 42} The appellate court may not merely substitute its view for that of the jury, and reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction."  Id., quoting *Martin*.

{¶ 43} In this matter, the convictions for sexual battery and sexual imposition are well supported in the evidence and do not present the exceptional case where the evidence presented weighs heavily in favor of the defendant and against conviction.   Accordingly, this court finds that defendant's convictions were not against the manifest weight of the evidence.   The second assignment of error is therefore overruled.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, ADMINISTRATIVE JUDGE

PATRICIA A. BLACKMON, J., and
KATHLEEN ANN KEOUGH, J., CONCUR